Ravin **SHARMA**, Ashvin Dhingra, Amit Bansal, James Rew, Chemtrade Solutions, Inc., Yang Woo Chemical America, Inc., J & J Chemtrading, Inc., Appellants,

v.

**VINMAR INTERNATIONAL, LTD.**, Vinmar Overseas, Ltd., Appellees.

No. 14–05–01088–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 25, 2007.

Rehearing and Rehearing En Banc Overruled July 26, 2007.

---

Howard Lynn Steele, John Jay Farrell, Murry B. Cohen, Ravin Sharma, Houston, Amit Bansal, Ashvin Dhingra, Spring, for appellants.

Craig Enoch, Austin, David Fowler Johnson, John Ellis O'Neill, John L. Hill, Jr., Sheryl Anne Falk, Stephen W. Schueler, William Guy Arnot, III, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and GUZMAN.

## OPINION

JOHN S. ANDERSON, Justice.

This is an accelerated, interlocutory appeal[1] from the granting of a temporary injunction against appellants, Ravin Sharma, Ashvin Dhingra, Amit Bansal, James Rew, Chemtrade Solutions, Inc. ("Chemtrade"), Yang Woo Chemical America, Inc. ("Yang Woo"), and J & J Chemtrading, Inc. ("J & J") in favor of appellee Vinmar International, Ltd. ("Vinmar").[2] After

conducting a two day evidentiary hearing the trial court entered a temporary injunction that, among other things, prohibits appellants from: (1) using or subleasing certain chemical storage tanks in Hamina, Finland for the purpose of storing isoprene monomer purchased from Russia; and (2) purchasing, transporting, storing, marketing, selling or trading isoprene monomer that is produced in Russia or caprolactum either supplied from Mexico or Belarus or sold in China.[3]

In six issues, the Rew appellants contend the trial court abused its discretion by granting a temporary injunction because (1) the allegedly injured party, Vinmar Overseas, Ltd. ("VOL"), was not before the trial court during the temporary injunction hearing; (2) the temporary injunction exceeds the relief requested by appellees; (3) the trial court blocked discovery and excluded evidence that prevented appellants from presenting their defense of unclean hands; (4) appellees did not prove they owned trade secrets; (5) appellees did not prove they would suffer irreparable injury for which they had no adequate legal remedy; and (6) the temporary injunction is overbroad as it is not narrowly tailored to protect trade secrets, and prevents lawful competition. We affirm.

## PROCEDURAL BACKGROUND

On June 29, 2005 Vinmar brought suit against appellants requesting a temporary restraining order, temporary and permanent injunctions, and other relief. That same day, Vinmar obtained a temporary

---

1. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (Vernon Supp.2006).

2. While all defendants in the trial court collectively filed a single notice of appeal, only appellants Yang Woo Chemical America, Inc., J & J Chemtrading, Inc., and James Rew submitted a brief to this court. When dealing

with these appellants as a group, we shall refer to them as "the Rew appellants."

3. The trial court's complete Amended Order for Issuance of Temporary Injunction is set out in the attached Appendix.

restraining order against appellants. The temporary injunction hearing occurred on August 15 and 16, 2005. On August 19, 2005 VOL intervened in the litigation. No motion to strike VOL's intervention was filed. On October 3, 2005 the trial court issued its Amended Order for Issuance of Temporary Injunction. This interlocutory appeal followed.

## FACTUAL BACKGROUND[4]

### A. Vinmar Is a Successful Trading Company.

Vinmar is an international chemical trading company conducting business all over the world. Vinmar has been in business for almost twenty-eight years and has grown from four original employees to more than 250 employees in offices around the globe. In 2004 Vinmar's gross revenues exceeded $1.3 billion.

### B. Vinmar's Trade Secrets Are a Key to Vinmar's Success.

The trading of chemicals is a personal business built on relationships between the suppliers, traders, and purchasers of the products. Successful trading companies like Vinmar devote time, money, and resources to develop the best contacts they can get and they encourage their employees to develop strong relationships with their supplier and customer contacts. Vinmar has spent years and millions of dollars developing the knowledge base behind its successful trading business. Vinmar's confidential knowledge base includes customer contact information. This contact information is more than just the knowledge that a particular company manufactures or purchases a particular chemical. It includes information such as who is the actual person at a particular company with the decision making authority, the fact the person responsible for purchasing a chemical has particular preferences such as shipping methods, or the company has particular needs that might be geographical, seasonal or other factors. Vinmar's confidential knowledge base also includes product information such as the requirements for storing a particular chemical; sales and purchase histories which provide trend information about the growth or shrinking of a particular customer's needs or supplier's product availability; profitability of Vinmar's traders; profit margins and pricing policies; internal documents and forms; terms of arrangements with customers and suppliers; structure of contracts; costs and expenses; and terms of financing arrangements. Finally, Vinmar's supply chains for moving a chemical from its place of manufacture to Vinmar's customers is part of Vinmar's confidential knowledge base. This knowledge base gives Vinmar an advantage over their competitors, and they vigorously protect the secret nature of this information.

Vinmar does not publicize this information and has devoted significant time, effort, and resources to maintaining the confidential nature of this information. Vinmar's steps to protect the secrecy of this knowledge base include: controlled access cards are required to enter Vinmar's offices, computers are password protected, all employees are required to execute confidentiality agreements acknowledging the confidential and secretive nature of the information as a condition of employment, employee manuals emphasize the confidential nature of Vinmar's business, and access to information is on a need-to-know basis such that Vinmar's

---

**4.** The factual recitation is stated in the light favoring the trial court's ruling, with conflicts in the parties' evidence resolved in support of the ruling. *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.,* 965 S.W.2d 18, 21 (Tex.App.-Houston [1st Dist.] 1998, no pet.).

traders cannot look at each other's files. The trial court found Vinmar's confidential information qualifies as trade secrets.

### C. The Individual Appellants' Roles at Vinmar.

The individual appellants (Rew, Sharma, Bansal, and Dhingra) are all former Vinmar employees. Each individual appellant, as a condition of employment, was required to execute a confidentiality or non-competition agreement containing a confidential information provision. Each agreement, regardless of the title, prohibited each employee, while employed by Vinmar, from investing in or engaging in a business competing with Vinmar. In addition, the agreements required each employee to maintain the confidentiality of all information related to Vinmar's business.

In 1997, Vinmar hired Rew. Prior to joining Vinmar, Rew had never worked as a chemical trader. While at Vinmar, Rew primarily traded styrene. By the time he resigned for unstated personal reasons in July 2003, Rew had risen to the position of general manager of Vinmar's chemical division. In that position, Rew had access to the profit files of all chemical traders and products and knew the profitability of the various transportation chains. Two months before he resigned from Vinmar, Rew established J & J, a Hong Kong company, as a direct competitor of Vinmar. Rew owns forty percent of J & J and J.D. Choi owns the remaining sixty percent. Prior to the incidents underlying this litigation, the vast majority of Rew's business at J & J involved the trading of styrene. In fact, Rew describes himself as the world's biggest styrene trader. In addition to J & J, Rew is involved with Yang Woo.[5] Prior to the events underlying this

litigation, Rew, J & J, and Yang Woo had not traded isoprene or caprolactum.

Bansal was a manager of banking and documentation at Vinmar. Through his position, Bansal gained access to every sales contract in Vinmar's chemical division. As part of his duties, Bansal saw most of the documents that defined a trade and would create a sales folder for each trade that included, among other things, the customer and price. Banking, finance, and letters of credit, all items within Bansal's responsibilities, are critical to Vinmar's financial success as they ensure Vinmar gets paid.

Dhingra was the head of operations, finance, and risk management for Vinmar. In his position as risk manager, Dhingra assessed all of Vinmar's chemical trading contracts to verify the traders were in compliance with Vinmar's policies and that supply and sales contracts matched up. In this role, Dhingra had access to most contracts and all of the traders' files and meetings.

Despite the doubts of Hemant Goradia, the current president of Vinmar, Vinmar hired Sharma straight out of business school as a trainee-trader in 1997. When he was hired, Sharma was instructed by Vinmar management to develop new business lines and this ultimately led to the development of Vinmar's Russian isoprene business. By the time Sharma resigned from Vinmar, he was the marketing manager and global product leader for isoprene and caprolactum, the chemicals he traded for Vinmar.

### D. Sharma's Involvement With Isoprene and Caprolactum.

When Sharma started work for Vinmar with the assignment of developing new

---

**5.** Rew's exact connection with Yang Woo is not clear in the record. J.D. Choi is the sole owner of Yang Woo. Choi and Rew formed J & J, a joint venture according to Rew. Despite this apparent separation, Rew testified during his deposition that people confuse the two companies as they operate as almost the same entity.

product lines, he spent several months researching products, markets, suppliers, and customers. One of the products Sharma investigated was isoprene. Isoprene is a relatively rare chemical product used in the manufacture of various adhesive products such as that used in sticky pads. Because international demand is high for isoprene and it is a relatively rare product, the potential profits to be made from trading isoprene are high. However, isoprene is a very unstable product as it must be kept pressurized. Because of the volatile nature of isoprene, working out a secure supply chain was not a simple or quick task. Sharma, in conjunction with Vinmar's Russian agent, Kachire Enterprises, Limited ("Kachire"), began searching for sources of isoprene in Russia in 1998. It was not until 1999, after much trial and error, that Sharma and his Kachire associates located a Russian supplier of isoprene,[6] customers for the isoprene, and worked out the logistics for getting the isoprene from the Russian supplier to Vinmar's customers. It was then that Vinmar made its first isoprene trade.

Initially, the isoprene was shipped in specialized rail cars from the manufacturer to Hamina, Finland where the isoprene was loaded directly onto tankers. While Sharma started searching for a storage tank in 1999, as soon as he located a Russian source of isoprene, a tank became absolutely essential to Vinmar's isoprene

business in 2003 when Finland, for environmental reasons, banned the loading of isoprene directly from rail cars onto tankers. In 2003, Sharma negotiated the lease of an isoprene capable storage tank in Hamina, Finland. VOL was the lessee of the tank. Sharma described the Hamina storage tank as the key to the entire isoprene business. Both VOL and Vinmar used the Hamina tank to store isoprene. Sharma was the Vinmar employee charged with the responsibility of maintaining the lease of the Hamina tank.

Despite the fact isoprene is a chemical in high demand and short supply, Vinmar's isoprene business did not become profitable until 2003. Sharma, in a March 2005 email to Goradia, wrote: "our efforts to stick with the product inspite [sic] of initial losses made on the first few deals six years ago (not including all of the logistical nightmares we had) and management hesitation to continue with it, is finally paying off now in a big way." That payoff was $5.5 million profit in the first five months of 2005 alone, with Sharma predicting the profits would continue for the foreseeable future.

In similar fashion, Sharma developed Vinmar's caprolactum business. Sharma made the initial contact with Univex, S. A., a caprolactum manufacturer in Mexico. From that initial contact Sharma learned about Univex's products and in his effort to develop the relationship and convince

---

**6.** Both Sharma and Hemant Goradia, the president of Vinmar, testified about the efforts required to locate a stable supplier of Russian isoprene. Sharma testified the development of Vinmar's isoprene business was a time consuming process. First, Sharma located names in various industry publications and made initial contact. Then, he set-up meetings, social as well as business, to develop the relationship. Goradia testified while there are many chemical plants in Russia listed in various industry publications as sellers of isoprene, Vinmar eventually learned the reality

is, there is only one, Togliatti, that sells for export. According to Goradia, Vinmar learned this information by trial and error and through the efforts of their local people. Initially, Vinmar did not know who the proper contacts were at Togliatti, the Russian isoprene supplier, or in Russia generally about isoprene. It took a considerable investment of time to not only make the contact with whoever is shown in the publications like "Who's Who in Chemicals" as responsible for a particular product, but to really identify the decision makers at the producer.

Univex to do business with Vinmar, Sharma completed the first transactions at a loss for Vinmar. In addition, Sharma worked with Kachire to develop Vinmar's caprolactum business out of Belarus. In both instances, Vinmar sold the caprolactum in China.

### E. Sharma Plots to Leave Vinmar, Join Rew, and Take the Hamina Tanks.

Despite being paid $352,000 in salary and bonus in 2004, during the spring of 2005 Sharma became dissatisfied with his role at Vinmar. Almost simultaneously with Sharma's rising discontent, in April 2005 Rew was approached by a client seeking isoprene. Rew attempted, through the use of the internet, to obtain isoprene on his own. Rew's effort was unsuccessful. Following that unsuccessful effort, in May 2005 Rew started talking to his friend Sharma about hiring Sharma. As part of this effort, during the middle part of May, Rew, a resident of Houston, Texas, invited Sharma, also a resident of Houston, Texas, to a meeting in Hong Kong to discuss not only hiring Sharma, but the creation of Worldchem, a new chemical trading company. Rew also invited Abbas Sadakat and Manjul Jain, both Kachire employees who worked closely with Sharma, to the meeting. Abbas attended the meeting, Jain did not.[7] During the meeting, the participants also discussed the isoprene capable storage tanks at Hamina. Not coincidentally, VOL's deadline to renew the Hamina tank lease was May 31, 2005. This knowledge was possessed only by key

Vinmar employees such as Sharma, and Finngas, the lessor of the tank. By late May, Sharma, who had decided he was definitely going to leave Vinmar, began discussions with Abbas and Rew about opening an office in Moscow. In addition, Sharma gave Rew an isoprene summary Sharma prepared while working for Vinmar. This summary contained information about product demand, customers, and suppliers. Sharma also admitted he gave J & J Vinmar's Mexican caprolactum contact information. Sharma knew Rew intended to go after the Hamina tanks. Upon his return from the Far East, Sharma spent the latter part of May avoiding direct contact with Viejo Virtanen, the manager of the Finngas Hamina tank farm.

While Sharma was making his own plans, Vinmar was attempting to maintain its control over the Hamina tank and, in fact, increase the number of tanks it had under lease. In April 2005, Goradia instructed Sharma to not only renew the Hamina tank, but to also get the only other isoprene capable tank at Hamina under lease as well. As of May 31, 2005, Finngas was ready to lease both tanks to Vinmar for a three month period at the existing rental rate. Sharma represented to Vinmar that he was taking care of renewing the Hamina tank lease and specifically stated he had obtained a one week extension to the May 31, 2005 renewal deadline.

On June 1, Rew telephoned Virtanen about leasing the isoprene tanks. Virtanen, who had never heard of J & J or

---

**7.** Among the issues discussed in Hong Kong was the ownership of Worldchem. The ownership was broken down by percentages: Sharma: 25.5%, Abbas: 15%; Jain: 25.5% and Rew: 17%. The record does not reveal the disposition of the remaining 17%. The initial plan called for Rew to hold Jain's ownership interest for an undetermined amount of time. Sharma testified that Jain's refusal to join the new company led to its failure before it ever really got started. However, Worldchem at least operated long enough to apply for trade disruption insurance for its projected isoprene trade originating in Russia and shipping through Hamina, Finland.

Yang Woo prior to Rew's call, confirmed he had tanks, but was not currently negotiating on them. The next morning Finnish time, but still June 1 in Houston, Sharma called Virtanen and told him he had left Vinmar, was joining Rew, and he was interested in leasing the isoprene tanks for his new company. Sharma asked Virtanen not to lease the tanks before he was able to arrange delivery of financial information about Rew's companies. Following that conversation, at 11:25 p.m. Houston time, Rew emailed Virtanen financial information about J & J and Yang Woo. Rew copied Sharma on the email. On June 2, at 12:29 a.m. Houston time, Sharma sent Virtanen an email titled "Tank Confirmation" in which Sharma, still a Vinmar employee, represented he had left Vinmar and confirmed Rew's offer to lease both isoprene tanks at Hamina for a period of 6 months. Sharma finally submitted, via email, his resignation from Vinmar at 3:14 a.m. on June 2, 2005.

Goradia learned the Hamina tanks had not been leased by Sharma on June 1. Vinmar then contacted Virtanen to inform him Vinmar wanted to keep the tanks. In a June 2 conference call, Goradia learned Virtanen had made repeated attempts during May to contact Sharma about renewing the tank lease and Sharma had not responded. Goradia also learned there had not been a one week extension granted to Vinmar by Virtanen as Sharma had represented.

Faced with competing offers on the two isoprene tanks, Virtanen consulted with the owner of the Hamina tank farm and the decision was made to stick with Vinmar, a known risk. Rather than call Vinmar, Virtanen instead called Sharma at home with the news that Finngas had de-

cided to go with Vinmar. Sharma immediately upped his offer to double the rent and they would pay the entire rental amount in advance. As it was double the money and no risk, Finngas leased both tanks to Sharma and Rew. Sharma signed the lease on behalf of Yang Woo.[8] Virtanen refused to identify the new lessee of the isoprene tanks to Vinmar.

By June 5, only days after he left Vinmar, Sharma had not only given J & J the contact information for the persons he did business with while at Vinmar, he had arranged a caprolactum shipment for J & J from Univex, the same supplier he used while at Vinmar. This caprolactum was shipped to Shanghai, China using the same port, Manzanilla, that he used while at Vinmar, and was sold to many of the same customers. In a matter of weeks, Sharma had completed six Mexican caprolactum shipments. Sharma was also working on caprolactum trades out of Belarus just as he had done for Vinmar.

Sharma also quickly negotiated a Russian isoprene shipment, 2,000 metric tons for July delivery, for J & J. This was something both Rew and Europa Polimari E & I, the largest oil company in Italy, had been unable to arrange in the past. In addition, Sharma, using the same ship broker he had used while at Vinmar, negotiated a six month contract with a shipping company to provide transport for isoprene out of Hamina. This contract was to commence on July 1, 2005, the day after Vinmar's tank lease formally expired. The ship broker mistakenly sent the email confirming this deal to Sharma's old Vinmar email address, finally revealing the extent of Sharma's activities and the identity of the new lessee of the Hamina tanks.

---

8. Originally the lease was to be in the name of J & J. However, Rew was unable to arrange quick payment from J & J's Hong Kong bank, so payment was made by Yang Woo. Finngas then changed the lessee to Yang Woo.

### F. Bansal and Dhingra Plot to Leave Vinmar and Join Sharma and Rew.

Both Bansal and Dhingra remained at Vinmar after Sharma resigned. Although he was still a Vinmar employee, Dhingra did not tell Vinmar he knew Sharma was the person trying to take control of the Hamina tanks. On June 6, Bansal and Dhingra set-up Chemtrade Solutions, Inc. ("Chemtrade") to provide logistics and documentation services in support of Rew's and Sharma's trades. These services were identical to the job Bansal performed at Vinmar. On June 7, after learning Dhingra had requested a copy of the Hamina tank lease on May 15 or 16, Goradia fired Dhingra. Even after Dhingra was fired, Bansal remained at Vinmar and even represented he was a loyal employee when directly questioned by management.

On June 10, Dhingra and Rew talked about Chemtrade handling logistics and documentation for Sharma's caprolactum trades. Following those discussions, Dhingra drafted a secrecy and non-competition agreement, which Rew signed on behalf of J & J. Dhingra and Bansal wanted to protect their trade secrets from disclosure. Chemtrade and J & J agreed that customers, suppliers, and technical data were all trade secrets. Following that agreement, Chemtrade handled the logistics and documentation for Sharma's caprolactum trades. Bansal worked on these trades while he was still employed by Vinmar. In exchange for these services, J & J paid Chemtrade $50,000. This was an unusually high commission for these types of services and Bansal admitted it was really a payment by J & J to support Chemtrade's start-up. Part of that money was used to make the initial payment for Houston office space for Chemtrade, which would be shared with Sharma and Rew. Bansal admitted he looked for that office space, along with Sharma and Rew, while he was still employed at Vinmar on a day when he had called in sick.

### G. The Temporary Injunction Hearing.

Larry Leibrock, a neutral forensic computer analyst jointly hired by the parties pursuant to court order, was the first witness. Leibrock testified his preliminary analysis of Sharma, Bansal, and Dhingra's computers located approximately 321,000 hits using the key word search "Vinmar." According to Leibrock, this translates into thousands of Vinmar documents on those computers. These documents dated from as early as 1988 and included an Excel spreadsheet containing credit card numbers belonging to Vinmar employees. Finally, Leibrock testified the preliminary investigation revealed indications of potential spoliation.

During the temporary injunction hearing Sharma, while denying he had any Vinmar trade secrets, admitted that some Vinmar information, such as the margins and profitability of isoprene and caprolactum, are trade secrets.[9] Bansal also testified Vinmar's customers, suppliers, and technical data are trade secrets. In addition, Bansal admitted he continued working on the caprolactum trade documentation after the temporary restraining order was entered. Dhingra testified that unless he was enjoined from doing so, he did not consider himself constrained from passing on any Vinmar information other than bank accounts. According to Dhingra, everything else was public information.

Finally, there was remarkable testimony in which Sharma and Bansal admitted lying under oath. Sharma admitted lying under oath about his involvement with the Hamina tank lease negotiations by J & J and Yang Woo and the Mexican caprolac-

---

**9.** When Sharma denied possessing any Vinmar trade secrets, Sharma testified all he had was his experience, trading skills, and his relationships with customers and suppliers.

tum trades. Bansal, in response to direct questioning by the trial court, admitted he had lied during his deposition as he was nervous and defensive during the deposition and he lies when he gets nervous and defensive. In addition to outright admissions of lying under oath, the individual appellants' testimony revealed efforts at concealing the truth about each appellant's activities leading up to the litigation. The testimony and documentary evidence also revealed not only an effort to destroy relevant documents, but also an attempt by the individual appellants to ensure a consistent story that minimized the premeditated aspects of their efforts to gain control of the Russian isoprene trade.

### STANDARD OF REVIEW

An applicant for a temporary injunction seeks extraordinary equitable relief. *In re Tex. Natural Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002). The sole issue before the trial court in a temporary injunction hearing is whether the applicant may preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). The status quo is the last actual, peaceable, noncontested status which preceded the pending controversy. *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 402 (Tex.App.-Houston [14th Dist.] 2000, no pet.). An applicant must plead and prove three elements to obtain a temporary injunction: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204.

The applicant for the temporary injunction is not required to establish that he or she will prevail upon a final trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993). The merits of the applicant's suit are not presented for review. *Davis*, 571 S.W.2d at 861. Our review is strictly limited to whether the trial court clearly abused its discretion in granting the temporary injunction. *Id.* at 862. We may not substitute our judgment for that of the trial court by vacating or modifying an injunction simply because we would have decided the issue differently. *Landry's Seafood Inn & Oyster Bar–Kemah, Inc. v. Wiggins*, 919 S.W.2d 924, 926 (Tex.App.-Houston [14th Dist.] 1996, no writ). Further, we may not reverse the trial court's order granting a temporary injunction unless its decision was so arbitrary that it exceeded the bounds of reasonable discretion. *Butnaru*, 84 S.W.3d at 204. The trial court does not abuse its discretion if the applicant pleads a cause of action and presents some evidence tending to sustain that cause of action. *RP&R, Inc.*, 32 S.W.3d at 402. This court will not assume the evidence taken at a preliminary hearing will be the same as the evidence developed at a full trial on the merits. *Davis*, 571 S.W.2d at 862. Furthermore, as the trial court functions as the fact finder in a temporary injunction hearing, an abuse of discretion does not exist where the trial court bases its decision on conflicting evidence. *Id. Nelkin v. Young*, 397 S.W.2d 956, 958 (Tex. App.-Texarkana 1965, writ ref'd n.r.e.). As the reviewing court, we must draw all legitimate inferences from the evidence in the light most favorable to the trial court's order granting a temporary injunction. *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21 (Tex. App.-Houston [1st Dist.] 1998, pet. dism'd).

### DISCUSSION

**A. Is the Injunction Invalid Because the Allegedly Injured Party Was Not Before the Trial Court?**

In their first issue, the Rew appellants raise several separate but related

arguments that the temporary injunction is invalid. First, the Rew appellants contend the temporary injunction is invalid as the only proper applicant, VOL according to the Rew appellants, was not before the trial court at the time of the temporary injunction hearing. Second, the Rew appellants assert the temporary injunction is invalid as VOL, again assuming VOL is the only proper applicant, failed to specifically plead or request injunctive relief through a timely, verified petition in intervention. Third, the Rew appellants argue the temporary injunction is invalid as VOL, once again assuming VOL is the only proper applicant, did not present evidence during the temporary injunction hearing. The Rew appellants base these arguments on (1) the undisputed fact that VOL was the lessee of the Hamina tanks; and (2) the assumption that the only issue before the trial court during the temporary injunction hearing was the Hamina isoprene tank. We disagree with the Rew appellants' position that VOL was the only proper plaintiff for the temporary injunction, thus rendering the temporary injunction invalid.

▆▆ Assuming *arguendo* that the Hamina tank lease was the only issue involved in the temporary injunction proceeding, Vinmar was still a proper plaintiff to seek injunctive relief. The parties disagree whether this is an issue of standing or capacity. A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996).

▆▆ It was undisputed that VOL was the lessee of the Hamina isoprene tank. However, while VOL was the lessee and was billed by Finngas for the tank throughput, there was undisputed testimony that: (1) VOL and Vinmar functioned as agents of each other when it came to the buying, selling, storing, and transporting of isoprene; (2) Vinmar and VOL had common ownership and were affiliates; (3) both Vinmar and VOL not only used the Hamina tank, but also owned the isoprene stored in it at various times during the lease; (4)Vinmar used VOL to obtain leases on storage tanks that Vinmar could use; and (5) Vinmar suffered damages as a result of the loss of the use of the Hamina isoprene tank. A principal has standing and capacity to raise its own claims even though an agent entered into the contract that is the basis of the claim. *See First Nat'l Bank of Wichita Falls v. Fite*, 131 Tex. 523, 115 S.W.2d 1105, 1109–10 (1938) (holding that an agent may make a contract for his undisclosed principal in his own name and the principal may sue or be sued on the contract). Vinmar has both capacity and standing to bring this litigation.

As Vinmar has both standing and capacity to bring this temporary injunction action, whether VOL was properly joined as a party and was entitled to injunctive relief is irrelevant and we need not address each of the Rew appellants' arguments under this first issue.[10] We overrule the Rew appellants' first issue.

## B. Did the Temporary Injunction Grant More Relief Than Vinmar Requested in its Pleadings?

In their second issue, the Rew appellants argue the trial court's temporary injunction should be dissolved as it grants

---

**10.** While VOL did intervene well before the trial court entered its temporary injunction order, the trial court granted injunctive relief only to Vinmar.

Vinmar more relief than Vinmar requested in its pleadings.

The Rew appellants admit Vinmar made several broad requests for injunctive relief: (1) enjoining appellants from working for any isoprene trading business; or alternatively, that they not sell to any Vinmar customers or buy isoprene from any Vinmar suppliers; (2) enjoining appellants from using or discussing Vinmar's trade secrets; (3) enjoining appellants from calling upon, soliciting, or sending any marketing communication of any kind to any of the actual, or prospective customer distributors that Vinmar disclosed to appellants; and (4) enjoining Sharma, Dhingra, and Bansal from working for any other company with which Sharma is employed or associated. In addition, Vinmar requested that appellants be enjoined from continuing to benefit from the use of Vinmar's confidential and proprietary information.

 The Rew appellants seek to impose a very specific pleading requirement on a temporary injunction applicant such that the petition must include the exact wording that ultimately appears in the temporary injunction order. However, there is no rule that imposes such a strict pleading requirement on temporary injunction applicants. Rule 682 governs the pleading requirements for injunctive relief and it provides: "No writ of injunction shall be granted unless the applicant therefor shall present his petition to the judge verified by his affidavit and containing a plain and intelligible statement of the grounds for such relief." TEX. R. CIV. P. 682. In addition, the Texas Supreme Court has not been hyper-technical in its interpretation of Rule 682. *See Walling,* 863 S.W.2d at 57 (holding that a trial court can grant a temporary injunction preserving the status quo pending trial on the merits even though the plaintiff's prayer does not include a request for equitable

relief following trial on the merits). Here, by pleading the facts underlying its causes of action and requesting the broad injunctive relief stated above, Vinmar complied with Rule 682. The trial court did not abuse its discretion when it narrowed the broad language found in the petition and granted Vinmar some, but not all of the injunctive relief it had asked for in its petition. For example, rather than enjoining appellants from working for any business trading isoprene or from making sales to any Vinmar customer or acquiring any isoprene from any Vinmar supplier as requested by Vinmar, the trial court enjoined appellants only from purchasing, transporting, storing, marketing, selling or trading isoprene monomer that is produced in Russia. We hold the trial court did not abuse its discretion when it granted injunctive relief narrower than the relief requested by Vinmar's pleadings. We overrule the Rew appellants' second issue.

## C. Did the Trial Court Err When it Refused to Permit Discovery on Appellants' Unclean Hands Defense and Excluded Evidence on Unclean Hands?

 In their third issue, the Rew appellants raise two points. First, they argue the trial court erred when it refused to permit discovery into Vinmar's alleged bribery to support appellants' affirmative defense of unclean hands. A party seeking an equitable remedy such as an injunction, must do equity and come into court with clean hands. *Neeley v. West Orange–Cove Consol. Sch. Dist.,* 176 S.W.3d 746, 812 n. 82 (Tex.2005). The allegation is that Vinmar should not be entitled to equitable injunctive relief because of its unclean hands. Second, they contend the trial court erred when, during the temporary injunction hearing, it excluded evi-

dence on appellants' affirmative defense of unclean hands.

### (1) The Order Denying Discovery.

■■■ Referencing an order allegedly signed by the trial court on August 3, 2005,[11] the Rew appellants assert the trial court erred when it prevented discovery into an alleged bribery scheme by Vinmar and Kachire, Vinmar's Russian agent. Appellate courts have jurisdiction to consider immediate appeals of interlocutory orders only if a statute explicitly provides for appellate jurisdiction. *Stary v. DeBord*, 967 S.W.2d 352, 352–53 (Tex.1998). Section 54.014 of the Civil Practice and Remedies Code governs the appeal of interlocutory orders. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014 (Vernon Supp. 2006). An appellate court must strictly construe section 51.014's grant of interlocutory jurisdiction because the Texas Legislature intended it to be a narrow exception to the general rule that only final judgments are appealable. *Ahmed v. Shimi Ventures, L.P.*, 99 S.W.3d 682, 688 (Tex. App.-Houston [1st Dist.] 2003, no pet.). As section 51.014 does not expressly provide for the interlocutory appeal of an order denying discovery, we are without jurisdiction to consider this part of the Rew appellants' third issue.

### (2) The Trial Court's Exclusion of Testimony Concerning Vinmar's Alleged Bribery.

During the temporary injunction hearing, appellants attempted, through the testimony of Sharma, to introduce evidence of alleged bribery by Vinmar and Kachire. According to the Rew appellants, this alleged bribery prevented them from lawfully competing in the Russian isoprene market thus establishing their unclean hands affirmative defense. Appellees objected to this entire line of questioning, asserting

the evidence was not relevant and the trial court sustained the objection. Appellants then made an offer of proof on this issue which the trial court heard in its entirety. Only Rew and Sharma testified during the offer of proof. Vinmar lodged numerous objections to the proffered testimony including hearsay, lack of personal knowledge, and leading, which the trial court repeatedly granted. Ultimately, Rew testified he had no personal knowledge of any bribery and Sharma's testimony about the alleged bribery was prefaced with phrases such as "to the best of my knowledge" and "I believe." The trial court determined the proffered testimony was insufficient and ruled the testimony was inadmissible. In their second point, the Rew appellants complain the trial court erred when it excluded this testimony of alleged bribery by Vinmar and Kachire.

■■■ An evidentiary ruling will not be overturned absent an abuse of discretion. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex.2000). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *E.I. du Pont de Nemours Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995). An appellant must show that: (1) the trial court erred in not admitting the evidence; (2) the excluded evidence was controlling on a material issue dispositive of the case and was not cumulative; and (3) the error in the exclusion of the evidence probably caused the rendition of an improper judgment. *Tex. Dep't of Transp.*, 35 S.W.3d at 617.

■■■ The testimony of Rew and Sharma is prohibited by Rule 602 of the Texas Rules of Evidence which states: "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding

---

**11.** There is no August 3, 2005 order denying discovery in the record.

that the witness has personal knowledge of the matter." TEX. R. EVID. 602. As neither Rew nor Sharma, the Rew appellants' only witnesses on this issue, had personal knowledge of any illegal bribery by Vinmar, the trial court properly excluded the testimony.

■ Even if the testimony was based on the witnesses' personal knowledge, the trial court still properly excluded it. The Rew appellants offered Rew's and Sharma's testimony in support of their unclean hands affirmative defense. The unclean hands defense requires that the litigation must be connected to the alleged improper conduct. *Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 410 (1960). The trial court properly excluded the testimony as Rew and Sharma failed to demonstrate how the alleged bribery harmed appellants. The Rew appellants argue the testimony establishes they were harmed as the alleged illegal bribery allowed Vinmar to unfairly dominate the Russian isoprene market thus preventing them from lawfully competing in that market. However, as we find below, the Rew appellants' efforts to enter the Russian isoprene market were based entirely on the misuse of Vinmar's trade secrets. In other words, they were not attempting to lawfully compete. Therefore, no action allegedly taken by Vinmar harmed any effort by the Rew appellants to lawfully compete in the Russian isoprene market. As the Rew appellants failed to produce any evidence as to how they were harmed by the alleged bribery, the trial court properly excluded the testimony.

Because the trial court did not abuse its discretion in excluding the unclean hands testimony, we overrule the Rew appellants' third issue.

## D. Did Vinmar Establish the Likelihood of Success on the Merits of its Trade Secrets Cause of Action?

■ In their fourth issue the Rew appellants argue the trial court abused its discretion when it granted Vinmar injunctive relief because Vinmar failed to establish a probable right to the relief sought as Vinmar did not prove it possessed trade secrets.[12] Through this issue, the Rew appellants are seeking a resolution on the merits of appellees' causes of action. This is not the purpose of an interlocutory appeal of a temporary injunction. *Davis*, 571

---

12. Appellees argue the Rew appellants waived this issue on appeal as they did not challenge each cause of action asserted by Vinmar in its petition. Initially, Vinmar is incorrect when it argues the Rew appellants must address each cause of action asserted in Vinmar's petition as the trial court made specific findings as to the causes of action on which Vinmar had established a likelihood of success on the merits. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (holding in a summary judgment context that when the order granting the summary judgment explicitly states the grounds relied upon in granting the summary judgment and the underlying motion contains other independent grounds for the same relief, the summary judgment can be affirmed only on the grounds specified in the trial court's order). These were: (1) misappropriation of trade secrets; (2) breach or assisted breach of the fiduciary duty not to disclose Vinmar's trade secrets; and (3) depriving Vinmar of the Hamina storage tanks through fraud or conspiracy to commit fraud. Misuse of Vinmar's trade secrets by appellants is the primary basis supporting each of these causes of action. This includes the fraud cause of action as the terms of Vinmar's lease with Finngas were not known outside the contracting parties and it was only through Sharma's knowledge of those terms that Sharma was able to orchestrate the takeover of the Hamina tanks. As the existence of Vinmar trade secrets is crucial to Vinmar establishing a probable right to the relief sought and the Rew appellants challenged Vinmar's proof of trade secrets, the Rew appellants have not waived the right to raise this issue challenging the temporary injunction.

S.W.2d at 861. In determining whether to grant trade secret protection through a temporary injunction, a trial court does not determine whether the information sought to be protected is, in law and fact, a trade secret; rather, the trial court determines whether the applicant has established that the information is entitled to trade secret protection pending the trial on the merits. *IAC, Ltd. v. Bell Helicopter Textron, Inc.,* 160 S.W.3d 191, 197 (Tex.App.-Fort Worth 2005, no pet.). The fact that a temporary injunction order was issued granting trade secret protection does not mean the protected information is a trade secret. *Id.* That issue will be decided upon the trial on the merits.

■■■■ A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *In re Bass,* 113 S.W.3d 735, 739 (Tex.2003). Customer lists, pricing information, client information, customer preferences, buyer contacts, blueprints, market strategies, and drawings have all been recognized as trade secrets. *T–N–T Motorsports,* 965 S.W.2d 18 at 22. "Secret" implies the information is not generally known or readily available. *Id.* However, the mere fact that knowledge of a product or process may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means. *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.,* 158 Tex. 594, 314 S.W.2d 782, 788 (1958). In Texas, courts condemn the employment of improper means to procure trade secrets. *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.,* 764 S.W.2d 274, 277 (Tex. App.-Houston [1st Dist.] 1988, no writ). The question is not "How could he have secured the knowledge?" but "How did

he?" *Id.* A person is liable for disclosure or use of a trade secret if he either (1) discovers the secret by improper means; or (2) his disclosure and use, after properly acquiring knowledge of the secret constitutes a breach of the confidence reposed in him. *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 769 (1958).

■■■■ Upon the formation of an employment relationship, certain duties arise apart from any written contract. *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 600 (Tex.App.-Amarillo 1995, no writ). One of those duties forbids an employee from using trade secret information acquired during the employment relationship in a manner adverse to the employer. *Id.* This obligation survives the termination of employment. *Id.* Although this duty does not bar the former employee from using the general knowledge, skill, and experience acquired during employment, it does prevent him from utilizing trade secrets acquired during the employment relationship. *Id.* at 600–01.

■■■■ To determine whether information constitutes a trade secret, a court applies the following six factors:

(1) the extent to which the information is known outside the claimant's business;

(2) the extent to which the information is known by employees and others involved in the claimant's business;

(3) the extent of the measures taken by the claimant to guard the secrecy of the information;

(4) the value of the information to the claimant and to its competitors;

(5) the amount of effort or money expended by the claimant in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass,* 113 S.W.3d at 739. The party claiming a trade secret need not satisfy all six factors because trade secrets do not fit neatly into each factor every time. *Id.* at 740. The status of the information claimed as a trade secret must be determined through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct. *Id.* at 739.

When viewed in the light most favorable to the trial court's order, as we must, the evidence supports each of the six factors and the trial court's determination that Vinmar possessed trade secrets.[13] There was evidence that Vinmar possessed information that was not known outside of its business. This included Vinmar's sale and purchase histories that provided Vinmar with trend information about their customers' demands and their suppliers' product inventory. There was also evidence that Vinmar made a concerted effort to maintain the secret nature of its information. These measures included requiring controlled access cards to enter Vinmar's offices; password protection of computers; requiring all employees to execute confidentiality agreements as a condition of employment; employee manuals that emphasize the confidential nature of Vinmar's business; and limiting access to Vinmar's trade secret information on a need-to-know basis to the extent that Vinmar's traders are not allowed to look at each other's files. There was also evidence that Vinmar possessed trade secret information that was impossible for some one outside Vinmar to properly acquire. This information includes the economics and margins to be realized in the Russian isoprene trade. There was also evidence that Vinmar's trade secret information would be difficult for outsiders to duplicate. This evidence included Rew's testimony that he tried, and failed, to access the isoprene market on his own, and the fact Europa Polimari E & I had been trying, unsuccessfully, for a great deal of time to access the Russian isoprene market. Vinmar presented evidence that it expended a great amount of time, effort, and money developing and maintaining the isoprene trade secret information. Sharma himself testified it took him more than a year to develop the Russian isoprene trade and it took four years for the Russian isoprene business to become profitable for Vinmar. Sharma also testified that he had to make his first few Mexican caprolactum trades at a loss for Vinmar to gain access to that supplier. Throughout this time, Sharma was a Vinmar employee and it was Vinmar bearing the risk and cost of developing the isoprene and caprolactum business. There was also evidence of the great value of the trade secrets to Vinmar: the Russian isoprene alone earned Vinmar a $5.5 million profit in the first five months of 2005. Sharma and Bansal both admitted Vinmar possessed trade secrets. Sharma testified that Vinmar's margins and profitability of isoprene and caprolactum are confidential. Bansal also testified Vinmar's customers, suppliers, and technical data are trade secrets.[14]

---

13. Within this issue, the Rew appellants argue the trial court improperly based its temporary injunction order on a finding that Vinmar possessed only confidential information and not trade secrets. However, while it did use the term "confidential information," the trial court expressly found, in finding 14, that Vinmar's confidential information satisfied each factor for trade secret protection and therefore qualified as trade secrets.

14. Customer lists are routinely given trade secret protection. *T–N–T Motorsports,* 965 S.W.2d at 22; *Miller Paper Co.,* 901 S.W.2d at 603–04; *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 552 (Tex.App.-Dallas 1993,

In addition, each of the individual appellants executed agreements with Vinmar recognizing they would receive trade secret information in the course of their employment. Finally, the record shows that Vinmar's success in the isoprene and caprolactum markets was based, in large measure on its sustained efforts over time, as well as its expertise in developing, competitively pricing, and selling chemicals. None of this institutional knowledge can be gleaned from general knowledge known outside Vinmar's business.

The Rew appellants argue the trial court abused its discretion in finding Vinmar possessed trade secrets as, according to the Rew appellants, the information is available through public sources, such as various trade reports, government records, and the internet. The evidence on the public availability of information about Vinmar's isoprene and caprolactum business was disputed. There was evidence that the publicly available sources of information contain mistakes, do not capture all of Vinmar's trades, and do not capture all of Vinmar's trade secrets for the listed trades. There was also evidence that no single, publicly available document revealed Vinmar's entire supply chain.[15] In addition, the evidence also indicated that the publicly available documents had omissions such as logistics costs, handling costs, in-land freight costs, cleaning expense, and other expenses. Even if some of Vinmar's information was susceptible to discovery through independent investigation of publicly available materials, the record does not establish that appellants obtained the information in that manner. There was undisputed testimony appellants (other than Rew's initial unsuccessful efforts prior to the events underlying this litigation) did not actually do any internet research on isoprene or caprolactum until this litigation had been instigated and was performed only after they were instructed to do so by trial counsel. We defer to the trial court's assessments concerning the weight and credibility of the evidence on whether Vinmar possessed trade secrets. *Davis*, 571 S.W.2d at 862; *Nelkin*, 397 S.W.2d at 958. Having determined there was some evidence reasonably supporting the trial court's finding that Vinmar possessed trade secrets, we overrule the Rew appellants' fourth issue.

## E. Did Vinmar Present Proof That Damages Would be an Inadequate Remedy?

 A party seeking a temporary injunction must show it has a probable, imminent, and irreparable injury in the interim between the temporary injunction hearing and the trial on the merits. *Butnaru*, 84 S.W.3d at 204. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any

---

no writ); *Am. Precision Vibrator Co.*, 764 S.W.2d at 278; *David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 757 (Tex.App.-Houston [1st Dist.] 1982, no writ); *Collins v. Ryon's Saddle & Ranch Supplies, Inc.*, 576 S.W.2d 914, 915 (Tex.Civ.App.-Fort Worth 1979, no writ).

15. We note that the Rew appellants' learned trial counsel, using some of these publicly available trade reports, while questioning Hemant Goradia, president of Vinmar, was unable to accurately recite the correct path Vinmar used to ship isoprene out of Russia. According to the Rew appellants' trial counsel, the isoprene was shipped by rail from Russia to Rotterdam, then sent by tanker to the port of Hamina, Finland. In reality, the isoprene was sent by rail to Hamina, stored in the Finngas tank and later loaded onto a tanker. The isoprene was frequently transferred to a different tanker in the port of Rotterdam.

certain pecuniary standard. *Id.* That is, the applicant has to establish there is no adequate remedy at law for damages. *Cardinal Health Staffing Network, Inc. v. Bowen,* 106 S.W.3d 230, 235 (Tex.App.-Houston [1st Dist.] 2003, no pet.). An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *Id.* In their fifth issue the Rew appellants argue the trial court abused its discretion when it entered its temporary injunction order as Vinmar failed to prove that damages would be an inadequate remedy. We disagree.

 When viewed in the light most favorable to the trial court's order, the evidence supports the trial court's finding that Vinmar has an irreparable injury pending trial on the merits. There was evidence the Hamina tanks were the key to Vinmar's Russian isoprene trade. Further, the evidence shows appellants were attempting to hire away Abbas and Manjul Jain, Vinmar's key contacts at Kachire, Vinmar's Russian agent. There was also evidence Sharma had disclosed all aspects of Vinmar's Russian isoprene business and Mexican caprolactum contacts to Rew and his companies, making it a simple task for Rew and his companies to not only enter these markets but gain complete control over them. The evidence also demonstrated that Rew had previously tried, and failed, to enter the isoprene trade on his own. As part of their argument Vinmar failed to introduce evidence of irreparable harm, the Rew appellants emphasize the fact that after losing the Hamina tank, Vinmar was experimenting with an Estonian tank as a replacement. However, the testimony was undisputed that it was not certain if this tank would work and Vinmar did not have it under a long term lease for that reason. From this evidence, it was within the trial court's discretion to infer that appellants' misuse of Vinmar's trade secrets threatened Vinmar with the total loss of its very profitable isoprene business. There was also evidence in the record that appellants' misuse of Vinmar's trade secrets similarly threatened Vinmar's caprolactum business in Mexico and Belarus.

 Injunctive relief may be employed when one breaches his confidential relationship in order to misuse a trade secret. *Luccous v. J.C. Kinley Co.,* 376 S.W.2d 336, 341 (Tex.1964). Injunctive relief is also proper to prevent a party, which has appropriated another's trade secrets, from gaining an unfair market advantage. *T-N-T Motorsports,* 965 S.W.2d 18 at 24. Irreparable harm may also be established by evidence that disclosure of trade secret information could enable competitors to misuse the marketing plans and strategies of the applicant and avoid the less successful strategies as well as the risk and expense of developing the strategies. *Mabrey v. SandStream, Inc.,* 124 S.W.3d 302, 319 (Tex.App.-Fort Worth 2003, no pet.). The misuse of trade secrets leading to the loss of an existing business is another example of irreparable harm entitling an applicant to injunctive relief. *Miller Paper Co.,* 901 S.W.2d at 602. The potential damage caused by the loss of Vinmar's isoprene and caprolactum business, even if not complete, cannot be easily calculated and therefore a legal remedy is inadequate. *T-N-T Motorsports,* 965 S.W.2d at 24. We find the trial court did not abuse its discretion in determining Vinmar has no adequate remedy at law. We overrule the Rew appellants' fifth issue.

### F. Did the Trial Court Grant an Overbroad Temporary Injunction?

In their sixth issue, the Rew appellants raise a dual attack arguing the temporary injunction granted by the trial court is overly broad. Specifically, the Rew appel-

lants complain of the following language in the temporary injunction order: "No Defendant shall engage in any way in the business of purchasing, transporting, storing, marketing, selling or trading Isoprene Monomer that is produced in Russia or Caprolactum either supplied from Mexico or Belarus or sold in China." According to the Rew appellants, rather than protecting Vinmar's trade secrets, the temporary injunction is so overbroad, it prevents the Rew appellants from lawfully competing in the Russian isoprene business and the caprolactum trade. The Rew appellants also argue the scope of the temporary injunction is not supported by the evidence. We disagree.

### 1) Does the Evidence Support the Temporary Injunction?

■ The Rew appellants argue the evidence does not support the scope of the temporary injunction order. The Rew appellants, pointing out some of the contested evidence before the trial court, assert the evidence did not establish that Vinmar's isoprene and caprolactum supply chains, particularly the sources and customers of the chemicals, were trade secrets deserving of protection, thus making the injunction overbroad. Once again, the Rew appellants are not viewing the evidence in the appropriate light, which requires us to view the evidence in the light most favorable to the trial court's temporary injunction order and to indulge all reasonable inferences in its favor. *Id.* at 21. There was evidence in the record, discussed in section D above, that the supply chains for both isoprene and caprolactum were trade secrets. In addition, there was evidence that while Togliatti was Vinmar's only isoprene supplier, there was also evidence that Togliatti was the only Russian manufacturer selling isoprene for export. There was also evidence that the success of any Russian isoprene trade, re-

gardless of the original source, is dependent on the availability and use of the Hamina storage tanks. Thus there was evidence supporting a general ban on the Rew appellants trading Russian isoprene as it would be dependent on their possession and use of the Hamina tanks, obtained through a wrongful disclosure of Vinmar's trade secrets. Finally, even if information about some parts of Vinmar's supply chains was publicly available, the question is not how could appellants have secured the knowledge, but how did they obtain it? *Am. Precision Vibrator Co.,* 764 S.W.2d at 277. The evidence, when viewed in the proper light, establishes the Rew appellants did not obtain the information on the isoprene and caprolactum business through independent research and effort, but through a breach of the confidential relationship between Vinmar and its former employees. The evidence supports the scope of the temporary injunction.

### 2) Does the Temporary Injunction Restrict Lawful Competition?

■ In this argument, the Rew appellants overlook the fact that the sole issue before the trial court in a temporary injunction hearing is whether the applicant may preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru,* 84 S.W.3d at 204; *Davis,* 571 S.W.2d at 862. The status quo is the last actual, peaceable, non-contested status which preceded the pending controversy. *RP&R, Inc.,* 32 S.W.3d at 402. The evidence was undisputed the Rew appellants had not traded any isoprene or caprolactum before the events underlying this litigation. To completely preserve the actual status quo, the trial court would have had to restrict the Rew appellants from doing any transactions in isoprene or caprolactum, regardless of the source or ultimate market. Instead of imposing a universal ban on the isoprene and caprolactum trade, the trial court, exercising its

discretion and seeking to protect Vinmar's trade secrets pending the trial on the merits, chose to impose the more limited restrictions noted above.

 While ordinarily a temporary injunction should operate as a corrective rather than a punitive measure, when a choice must be made between a failure to provide adequate protection of a recognized legal right and the punitive operation of the writ, the latter course must be taken.[16] *Huffines,* 314 S.W.2d at 773. It is well settled that injunctive relief "must, of necessity, be full and complete so that those who have acted wrongfully and have breached their fiduciary relationship, as well as those who willfully and knowingly have aided them in doing so, will be effectively denied the benefits and profits flowing from the wrongdoing." *Mabrey,* 124 S.W.3d at 316 (quoting *Elcor Chem. Corp. v. Agri–Sul, Inc.,* 494 S.W.2d 204, 212 (Tex.Civ.App.-Dallas 1973, writ ref'd n.r.e.)). Here, the evidence demonstrates the Rew appellants gained access to the Hamina tanks, the Russian isoprene market, and the Mexican and Belarusian caprolactum trade into China solely through the improper acquisition and use of Vinmar's trade secrets. Far from being an overbroad order that forbids lawful competition, the trial court's order is narrowly tailored to preserve the status quo by protecting the secrecy of Vinmar's trade secrets and remedying the violence to the confidential relationship through which the Rew appellants acquired those trade secrets. *Id.* at 310–11. As the temporary injunction order is supported by the evidence and does not restrict lawful competition, but instead preserves the status quo

by protecting Vinmar's trade secrets, we overrule the Rew appellants' sixth issue.

## CONCLUSION

Having overruled all of the Rew appellants' issues on appeal, we affirm the trial court's granting of the temporary injunction order protecting Vinmar's trade secrets.

### APPENDIX

Cause No.2005–42636

VINMAR INTERNATIONAL, LTD., Plaintiff,

v.

RAVIN SHARMA; ASHVIN DHINGRA AMIT BANSAL; JAMES REW; CHEMTRADE SOLUTIONS, INC.; YANG WOO CHEMICAL AMERICA, INC.; J & J CHEMTRADING, INC.; and Others Unknown, Defendants.

IN THE DISTRICT COURT OF HARRIS COUNTY, TEXAS 333RD JUDICIAL DISTRICT

#### AMENDED ORDER FOR ISSUANCE OF TEMPORARY INJUNCTION

Plaintiff Vinmar International, Ltd. has filed a verified petition for a temporary injunction and requested injunctive relief as set forth in Plaintiff's Verified Original Petition and Application for Temporary and Permanent Injunctions, and Other Relief. After due notice to the parties, the petition for temporary injunction came on for hearing on August 15, 2005. The parties appeared in person and by their attorneys. After considering Plaintiff's application for temporary injunction, the pleadings, evidence, and arguments of counsel, the Court finds the Plaintiff has demonstrated a probability of success on

---

**16.** We note the most expeditious way to obviate the hardship and discomfiture of an unfavorable temporary injunction order is to try the case on the merits and secure a hearing wherein the case may be fully developed and the courts, both trial and appellate, may render judgments finally disposing of controversies. *Sw. Weather Research, Inc. v. Jones,* 160 Tex. 104, 111, 327 S.W.2d 417, 422 (1959).

the merits and probable injury in the interim. The Court therefore issues this temporary injunction, as such injunction is necessary to preserve the status quo of the litigation pending a trial on the merits.

Supporting the issuance of this temporary injunction are the following Findings of the Court:

1. Vinmar is a worldwide trading company that buys and sells various chemicals throughout the world, including Isoprene Monomer, Caprolactum, plasticizers, and others.

2. Defendants Ravin Sharma, James Rew, Amit Bansal, and Ashvin Dhingra are all former employees of Vinmar who executed confidentiality and non-compete agreements with Vinmar in which each promised not to disclose Vinmar's confidential information or otherwise use the information for any purpose other than to benefit Vinmar.

3. Neither Defendants Sharma, Rew, Bansal, nor Dhingra had any prior experience or training in chemical trading before joining Vinmar. All of their knowledge about chemical trading was acquired through their employment with Vinmar.

4. In exchange for Defendants Sharma's, Rew's, Bansal's, and Dhingra's promises not to disclose confidential information or otherwise use the information for any purpose other than to benefit Vinmar, Vinmar provided each defendant with extensive amounts of confidential information and trade secrets, as well as training in chemical trading.

5. The confidential information that Vinmar possesses and that Defendants Sharma, Rew, Bansal, and Dhingra acquired includes information regarding:

 a. customer contact information;

 b. supplier contact information;

 c. profit margins, profitability, and expenses;

 d. transactional histories, including specific details of Vinmar's past purchases from suppliers and past sales to customers;

 e. pricing and pricing formulas;

 f. the term, leases amounts, and other conditions of Vinmar's leases with Finngas for storage tanks located in Hamina, Finland;

 g. logistical details and information regarding methods, costs, and expenses included in the transportation, storage, handling, and delivery of Isoprene;

 h. logistical details, price, terms and conditions relating to Caprolactum in Mexico or Belarus and the shipment of Caprolactum to China;

 i. all information about the cost and expenses which Vinmar incurs or has incurred in its business operations;

 j. financial statements; and

 k. other terms of arrangements with customers and suppliers of goods and services.

6. Vinmar has expended substantial resources, time, and money compiling, obtaining, and maintaining its trade secret, confidential, and proprietary information.

7. Defendants Sharma, Rew, Bansal, and Dhingra acquired this information solely through their confidential relationship with Vinmar and not through any public sources or domains.

8. Defendants Bansal and Dhingra had access to all of Vinmar's confidential information in order to perform their responsibilities in providing logistics and documentation for each chemical traded by Vinamar.

9. Using Vinamar's confidential information, Defendants Sharma, Rew, Bansal, and Dhingra executed trades and conducted business from locations located worldwide, including Russia, Belarus, Europe, China, Asia, Mexico, the United States, South America, India, and Japan.

10. This confidential information is not generally known to competitors and gives Vinmar a competitive advantage in the chemical trading industry.

11. Vinamar safeguards this information by utilizing controlled access cards and computer passwords, as well as having each employee execute confidentiality and non-compete agreements acknowledging the confidential and secretive nature of the information.

12. Vinmar employees were granted access to confidential data concerning each chemical on a "need-to-know" basis.

13. Vinmar did not publicly disclose or otherwise divulge its confidential information.

14. Vinmar's information maintains a substantial element of secrecy and satisfies each factor for trade secret protection. The information is therefore trade secret, confidential, and proprietary information.

15. Using the confidential information that they procured from Vinmar, Defendants Sharma, Bansal, Dhingra, and Rew began competing with Vinmar while each was still employed with Vinmar.

16. These businesses were established to trade the same chemicals, purchasing from the same suppliers, and selling to the same customers, as Defendants Sharma, Bansal, and Dhingra had previously done at Vinmar.

17. Defendants Sharma, Bansal, Dhingra, and Rew never disclosed to Vinmar that each was competing with Vinmar and using the confidential contacts and information that each procured from Vinmar to assist competitive businesses gain advantage in the chemical trading industry.

18. Defendants Sharma, Bansal, Dhingra, and Rew have taken, used, and disclosed Vinmar's trade secret, confidential, and proprietary information to competitors of Vinmar.

19. Defendants Sharma, Bansal, and Dhingra have taken, used, and disclosed Vinmar's trade secret, confidential, and proprietary information for the benefit of Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America.

20. In May 2005, while Defendant Sharma was still employed at Vinmar, he and Defendant Rew conspired to begin a competitive company called WorldChem. The two never disclosed to Vinmar that they were establishing this competitive business.

Defendants Sharma and Rew actively solicited other Vinmar employees, including Manjul Jain and Abbas Sadakat, to join their competitive company.

21. In May 2005, Defendants Rew and Sharma met in Hong Kong with Abbas Sadakat to discuss the structure and layout of WorldChem and their entry into the Isoprene market. At this time, Sharma was employed by Vinmar.

22. Finngas would have renewed the Finngas leases with Vinmar under the original terms and prices that it had previously, but for Defendants Sharma, Bansal, and Dhingra's acts of deception and fraud.

23. In May and June 2005, Vinmar had a reasonable expectation that it would continue to lease and control Isoprene storage tanks from Finngas located in Hamina, Finland.

24. While still employed with Vinmar, Defendant Sharma helped Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America take the Finngas storage tank leases away from Vinmar and allowed Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America to enter the competitive industry of Isoprene trading.

25. Vinmar and its affiliated corporation, Vinmar Overseas, Ltd. ("Vinmar Overseas"), each act, and have acted, as agent of the other with respect to the purchase, transportation, storage and sale of isoprene produced in Russia through the storage tanks located in Finland.

26. Both Vinmar and Vinmar Overseas have been generating revenues from the sale of isoprene and the use of the storage tank in Finland.

27. The lease with Finngas was negotiated by Vinmar for the benefit of itself and Vinmar Overseas.

28. While employed at Vinmar, Defendants Sharma and Dhingra intentionally allowed the time for renewal of the Finngas leases to expire. This conduct constitutes a breach of Defendants' fiduciary duties owed to Vinmar.

29. Without leases to the Finngas storage tanks, Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America would never have been able to engage in the business of buying and selling Isoprene in Russia.

30. Neither Defendants Rew, J & J Chemtrading, nor Yang Woo Chemical America had any experience in, or knowledge about, buying, selling, or trading Isoprene, Caprolactum, or plasticizers prior to June 1, 2005.

31. All information that Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America have regarding Isoprene and Caprolactum was acquired solely from Defendants Sharma, Bansal, and Dhingra. This information came from Vinmar and is trade secret, confidential and proprietary.

32. Defendants' use of Vinmar's trade secret, confidential, and proprietary information constitutes wrongful competition against Vinmar.

33. Defendants Sharma, Bansal, and Dhingra conspired with Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America to (1) convert Vinmar's trade secret, confidential, and proprietary information, and (2) use Vinmar's trade secret, confidential, and proprietary information to wrongfully compete against Vinmar in the business of buying, selling, and trading Isoprene, Caprolactum, and plasticizers.

34. Defendants Sharma, Bansal, and Dhingra breached fiduciary duties owed to Vinmar. Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America assisted this breach.

35. Defendants Sharma, Rew, and Bansal lied under oath on multiple occasions in this proceeding, both in depositions and at trial.

36. Rew signed an agreement with Vinmar during the course of his employment by Vinmar that prohibited him from soliciting employees of Vinmar for two years after the termination of his employment.

37. During the two years after termination of his employment, Rew repeatedly and continually violated the provisions of this agreement by soliciting Sharma to come to work for him.

38. There is some evidence that Defendants have deleted or attempted to destroy emails and other documents in order to cover their actions.

39. Saved on Defendants Sharma, Bansal, Dhingra, Rew, and Chemtrade Solutions personal computers are over 300,000 Vinmar documents that Defendants took from Vinmar upon leaving the company. These documents were wrongfully obtained and retained by Defendants Sharma, Bansal, Dhingra, Rew, and Chemtrade Solutions in violation of the Temporary Restraining Order and agreements.

40. All Defendants failed to timely produced documents as previously ordered by the Court in issuing the Temporary Restraining Order and as agreed.

41. Defendants Rew, J & J Chemtrading, and Yang Woo Chemical America have been negotiating with Vinmar's competitors to sublease the Finngas tanks in violation of the Temporary Restraining Order.

42. Defendants have been using Vinmar's confidential information to establish competitive businesses and compete against the company. Absent an injunction, Defendants will continue to use Vinmar's confidential information for personal gain to the detriment of the company.

43. Damages from Defendant's misuse of Vinmar's confidential information are immeasurable, and there is no indication that Defendants can satisfy an award in damages or will remain within the country to do so.

44. Defendants' conduct in competing against Vinmar, including actively trading chemicals through contacts and sources learned at Vinmar, and including establishing competitive businesses while each was employed at Vinamar, has left Vinmar with no choice but to seek injunctive relief to prevent Defendants' ongoing misuse and misappropriation of Vinmar's trade secrets.

45. Vinmar has a probable right to recover pending trial on its claim for misappropriation of trade secrets. Vinmar owns trade secrets. Defendants have used Vinmar's trade secrets in breach of both their contractual and confidential relationship with Vinmar, and Defendants have acquired the trade secrets through improper means. Rather than attempt inde-

pendent investigation and research to discover the confidential information at issue, Defendants abused their confidential relationships with Vinmar to obtain the knowledge.

46. Vinmar has a probable right to recover pending trial on its claim for Defendants' breach or assisted breach of the fiduciary duties each Defendant owed to Vinmar. Defendants acquired and abused a confidence that Vinmar reposed in Defendants Sharma, Bansal, and Dhingra. Defendants owed Vinmar a fiduciary duty not to disclose Vinmar's trade secrets or use these trade secrets for personal gain, and Defendants betrayed this trust.

47. Vinmar has a probable right to recover pending trial on its claim for Defendants' fraud or conspiracy to defraud Vinmar. Defendant Sharma represented to Vinmar management that the tank leases would be renewed and never disclosed to management that he was working for a competitive company to acquire the tanks. All defendant [sic]assisted this conduct, and such conduct constitutes actual and constructive fraud.

48. Vinmar has a probable injury pending trial. Defendants possess Vinmar's confidential information and are in a position to continue using it to compete with Vinmar in the industry. This threatened use leaves Vinmar facing imminent harm and irreparable injury, with no adequate remedy at law.

It is, therefore, ORDERED that this Temporary Injunction is hereby entered and shall remain in full force and effect against all parties enjoined therein until trial of this case.

It is, therefore, ORDERED that Defendants Ravin Sharma, Ashvin Dhingra, Amit Bansal; James Rew, Chemtrade Solutions, Inc., Yang Woo Chemical America, Inc. J & J Chemtrading, Inc. are hereby enjoined, until the final trial hereof, as follows:

1. No Defendant shall use or sublease the Finngas storage tanks located in Hamina, Finland for the storage of Isoprene Monomer purchased from Russia;

2. No Defendant shall engage in any way in the business of purchasing, transporting, storing, marketing, selling, or trading Isoprene Monomer that is produced in Russia or Caprolactum either supplied from Mexico or Belarus or sold in China;

3. Defendants shall return all Vinamar records and documents back to Vinmar that each Defendant may possess and shall not use the information contained in such records or documents for any purpose;

4. No Defendant shall use or disclose to any person for any purpose any part of Vinmar's trade secret or confidential information, which shall mean and include all of the following:

(1) All information regarding Vinmar's purchase or acquisition of Isoprene in Russia, including the price, terms, and conditions of sale and the identity of all Vinmar's suppliers of Isoprene;

(2) All information about the transportation and storage of Isoprene including all information regarding the Finngas storage facilities located in Hamina, Finland, and the terms, conditions, and past history of Vinmar's contract or lease agreement for such facilities;

(3) All information about Vinmar's sales of Isoprene, including the prices, terms, conditions, and type of sales transactions which Vinmar has entered into;

(4) All information about Vinmar's customers, including their purchase and transactional histories, their general needs and requirements, and the specific terms and conditions of the various sales and other transactions which Vinmar has entered into with its customers, and further including the name and all information about the person or persons who make decisions on behalf of Vinmar's customers to purchase Caprolactum;

(5) All information about Vinmar's customers, including their purchase and transactional histories, their general needs and requirements, and the specific terms and conditions of the various sales and other transactions which Vinmar has entered into with its customers, and further including the name and all information about the person or persons who make decisions on behalf of Vinmar's customers to purchase Isoprene Monomer;

(6) Profit margins, profitability, and expenses;

(7) Pricing and pricing formulas;

(8) Logistical details and information regarding methods, costs, and expenses included in the transportation, storage, handling, and delivery of Isoprene;

(9) Logistical details, price, terms and conditions relating to Caprolactum in Mexico or Belarus and the shipment of Caprolactum to China;

(10) All information about the cost and expenses that Vinmar incurs or has incurred in its business operations; and

(11) Financial statements.

It is further ORDERED that this order shall be effective upon Plaintiff posting a bond in the amount of $2,500,000.00.

It is further ORDERED that this case is set for trial on the 3rd day of April, 2006.

SIGNED this 3rd day of October, 2005.

/s/ Judge Joseph J. "Tad" Halbach, Jr.
Judge Presiding

EVA M. GUZMAN, Justice, concurring and dissenting.

I concur in the majority's disposition of five of the six issues presented on appeal; however, I respectfully disagree with the majority's holding affirming Paragraph 2 of the injunction, which states, "No Defendant shall engage in any way in the business of purchasing, transporting, storing, marketing, selling, or trading Isoprene Monomer that is produced in Russia or Caprolactum either supplied from Mexico or Belarus or sold in China." Because I agree with the Rew appellants that this paragraph of the temporary injunction is overly broad, I would modify this portion of the trial court's order as to these parties. *See T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 25 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd) (modifying an overly broad injunction).

The majority correctly notes that the purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). But, as we have previously stated, an injunction "may not be framed so broadly as to prohibit the enjoyment of lawful rights." *Kulkarni v. Braeburn Valley W. Civic Ass'n, Inc.*, 880 S.W.2d 277, 278 (Tex.App.-Houston [14th

Dist.] 1994, no writ) (citing *Hellenic Inv., Inc. v. Kroger Co.,* 766 S.W.2d 861, 866 (Tex.App.-Houston [1st Dist.] 1989, no writ)). A temporary injunction is impermissibly overbroad if it prohibits not only the use of confidential and proprietary information, but lawful conduct as well. *See Sw. Research Inst. v. Keraplast Techs., Ltd.,* 103 S.W.3d 478, 482–83 (Tex.App.-San Antonio 2003, no pet.).

The majority emphasizes that the Rew appellants traded no isoprene or caprolactum before the events underlying this litigation; however, this observation does not fully reflect the status quo *ante.* Before the present controversy arose between the parties, the Rew appellants had a limited legal right to engage in international chemical trading. Although the Rew appellants did not exercise that right, the right nevertheless existed, albeit within certain limits. For the purposes of this discussion, these limits were defined by the non-competition and confidentiality agreements described in the majority's opinion and by the prohibition against the improper use of trade secrets. Accordingly, the Rew appellants could engage in international chemical trading if they acted within these boundaries. But, the temporary injunction arbitrarily replaces these contractual and common law limits with geographical boundaries, imposing barriers based on a chemical's country of origin or sale.

The majority implies that this distinction is immaterial on the facts presented, and recites that while Togliatti was Vinmar's only isoprene supplier, there "was also evidence that Togliatti was the only Russian manufacturer selling isoprene for export." But, unlike the Rew appellants, the international isoprene and caprolactum markets are not bound to maintain the status quo as it existed before this controversy arose; new suppliers and customers may enter the market during the pendency of the litigation, and alternate transport and storage facilities may become available. Under the language of the injunction, the Rew appellants are not only prohibited from dealing with suppliers and customers known to the Rew appellants through the improper use and disclosure of Vinmar's confidential information, but currently are enjoined from commerce with *any* isoprene supplier in Russia, *any* caprolactum supplier in Mexico or Belarus, and *any* caprolactum purchaser in China, even if such entities are new entries in the market or are otherwise strangers to Vinmar. The injunction likewise bars the Rew appellants from purchasing from new suppliers for resale within the same country, even where Vinmar purchased chemicals solely for export. The Rew appellants are even enjoined from transporting or storing isoprene originating in Russia, caprolactum supplied by Mexico or Belarus, and caprolactum sold in China, even if they use methods, facilities, and supply chains never used by Vinmar.

In sum, the Rew appellants are enjoined from trading with new suppliers, establishing original supply chains, using alternative storage and transport facilities, and developing untapped markets for the sale of isoprene or caprolactum in those nations where Vinmar operates—regardless of whether such actions infringe on appellees' rights. Moreover, the injunction does not restrict the Rew appellants' ability to compete for only six months, as specified in the non-competition and confidentiality agreements with Vinmar, but has been in effect for over a year, and will continue until trial.

Because the injunction imposes restrictions on the Rew appellants beyond those arising from their relationship with Vinmar and enjoins them from engaging even in lawful competition that does not involve

the use of confidential information, I would hold that the trial court abused its discretion by granting the injunction in its current overly broad form.