Opinion issued
October 7, 2010

 



In
The

Court of
Appeals

For
The

First District
of Texas

———————————

NO. 01-09-00098-CV

———————————

James E. glattly, David Molina, Specialized
Components, Inc., Andrew Boyd, ABCO Products, Inc. and filiberto Fuentes, Jr., Appellant

V.

Air Starter
Components, Inc.,
Appellee



 



 

On Appeal from the 268th
District Court

Fort Bend County, Texas



Trial
Court Case No. 02-DCV-126607

 



 

 

O P
I N I O N

 

          This
appeal primarily concerns a claim that a newly formed company misappropriated
the trade secrets of an established company. 
Air Starter Components, Inc. (“Air Starter”), the established company, obtained
a judgment for misappropriation of trade secrets against the newly formed
company, Specialized Components, Inc. (“Specialized”), its shareholders James
E. Glattly, David Molina, Andrew Boyd, and its salesman, Filiberto Fuentes Jr.,
jointly and severally for $168,036.  Air
Starter also obtained a judgment for tortious interference with contract for
$600,000 against the same parties, as well as another company, ABCO Products,
Inc., jointly and severally.  In addition
to damages, Air Starter received an injunction prohibiting Specialized,
Glattly, and Molina from using Air Starter’s trade secrets.

          All
of the parties filed notices of appeal. 
In one appeal, Specialized, Glattly, and Molina contend that the trial
court’s judgment is erroneous because (1) Air Starter did not prove its damages
for lost profits with reasonable certainty, (2) as a matter of law, there can
be no tortious interference with an unenforceable covenant not to compete, (3)
there is no evidence to pierce the corporate veil to hold Glattly and Molina,
as shareholders, personally liable for the corporate obligations of
Specialized, and (4) Glattly is not liable for misappropriation of trade
secrets.  

Boyd, Fuentes, and ABCO
raise similar issues in another appeal, asserting the trial court erred because
(1) lost profits were not proven to a reasonable certainty, (2) an
unenforceable covenant not to compete cannot be the basis of a tortious
interference with contract claim, and (3) there is no evidence to support
piercing the corporate veil to hold Boyd and Fuentes liable for Specialized’s
obligations.

          Air
Starter raises eight issues in its appeal. 
It contends the trial court erred by determining that the contract with
Fuentes was a covenant not to compete because res judicata prevented the trial
court from addressing issues that had been raised in the temporary injunction
hearing; by finding that the language of the agreement indicates it is not a
covenant not to compete; by failing to award attorney’s fees to Air Starter on
its Texas Theft Liability Act claim; by entering an injunction that prohibited
use of trade secrets for a period of 30 years rather than permanently; by
failing to award attorney’s fees to Air Starter for breach of contract; and by
failing to require Specialized to provide Air Starter complete, un-redacted
copies of Specialized’s hard-drives during discovery.

          We
conclude there is no evidence to support the jury’s award for lost profits
damages.  Accordingly, we reverse that
portion of the trial court’s judgment awarding Air Starter damages and render
judgment that Air Starter take nothing on its claim for damages.  We further conclude the trial court abused
its discretion in limiting the injunction prohibiting Specialized, Glattly, and
Molina from using Air Starter’s trade secrets to a term of 30 years.  We therefore modify that portion of the trial
court’s judgment to exclude the time limit and, as modified, affirm.




 

I.  Background

          In setting out the background for this
case, we discuss (A) an overview of the parties involved, (B) the relationship
of the parties leading up to the lawsuit, and (C) the lawsuit. 

          A.      Overview of Parties

          Air Starter is one of the oldest and
largest companies in the after-market air starter business.[1]  Jack Heck is the owner and president of Air
Starter.  Air Starter manufactures,
repairs, refurbishes, and sells air starters and component parts to customers
all over the world.  Air Starter makes
some, but not all, of the air starter parts it sells.  Other parts that Air Starter sells are made
for Air Starter by “job shop machine shops,” including, for a while, Specialized.
 On several occasions, Air Starter
provided Specialized with drawings to be used by Specialized to bid or make a part
for Air Starter. 

          Molina went to work for Air Starter in
the early 1990s as a starter technician. 
A starter technician rebuilds and refurbishes old air starters that are
sent in to be repaired or replaced.  While
working at Air Starter, Molina attended school at night to learn AutoCAD, a
computer-aided software program used for design and drafting.  Molina began making AutoCAD drawings for many
of the air starter parts made by Air Starter. 
Much of this work was done at home, on his own computer and time.  Molina took the drawings back and forth from
his home to the Air Starter shop on floppy disks and often used the drawings to
answer questions raised in late night calls from the night production shift. 

          Fuentes went to work for Air Starter
in April 1992 cleaning and repairing air starters.  In 1996, Fuentes was promoted into sales.  Fuentes was initially assigned responsibility
for sales in the East Coast region, but the sales territory changed to South
Texas, and then it changed to international sales where he remained until
leaving Air Starter in June 2002.  

          When it was started in 1996, Specialized
began as a “job shop machine shop” specializing in precision machining.  A job shop machine shop makes parts on an
order-by-order basis using specifications or designs provided by the customer.  Air Starter was a Specialized customer.  Glattly and Bob Morson were the original shareholders
of Specialized.  In early 2001, Glattly,
seeking to expand Specialized, brought in additional investors Boyd, Richard Kellogg,
and Jerry Ward to become shareholders of Specialized.  

          Boyd
is the owner of ABCO Products, Inc. (“ABCO”). 
ABCO was one of Specialized’s earliest and best customers.  Another company owned by Boyd, MPV, was also
an early customer of Specialized.  At the
beginning of 2002, Boyd became a director of Specialized. 

          B.      Relationship
of Parties Leading up to the Lawsuit

          Three events are the primary reasons
for the disagreements between Air Starter and Specialized: (1) Molina
left Air Starter to work for Specialized; (2) Specialized expanded into the air
starter market; and (3) Fuentes left Air Starter to work for Specialized.

                    1.       Molina
becomes employed by Specialized 

 

          In 2001, Specialized decided to hire
another machinist to help with backlogged orders and to allow Morson to
concentrate his work efforts on sales.  Morson
knew Molina from delivering parts to Air Starter and suggested that they
consider him.  Morson spoke to Molina on
several occasions about coming to work for Specialized.  In March 2001, Specialized offered Molina a job
as Production Manager, with benefits that included a small stock position and starting
bonus.  Unhappy at Air Starter, Molina
was looking to make a change, and he started work at Specialized on April 2,
2001.

          While at Air Starter, Molina had
maintained the files that contained the drawings and production information for
each product that Air Starter manufactured. Molina kept these documents in a
filing cabinet in the machine shop.  Shortly
after Molina left Air Starter, Air Starter discovered that many of the files in
the machine-shop filing cabinet were empty. Use of these drawings could save
two or more weeks in the production of the products.

          One month after Molina’s departure, Air
Starter’s general manager recovered from Specialized a sealed box that was
located in Molina’s office at Specialized. The box had been taken from Air
Starter’s premises the previous day by an Air Starter employee who claimed that
he had taken the box to Molina at Molina’s request.  The box contained the raw castings of one
rotor, a “completely machined” rotor, and a pinion gear, as well as drawings
for parts.  Two months after the employee
brought the box to Molina, Specialized began producing parts corresponding to
the drawings in the box.

          With Molina’s help, Specialized had
caught up on the backlog of orders that had existed when he started work.  Morson and Molina began looking for additional
machining work.  Morson contacted Air
Myte about the possibility of Specialized machining some parts for Air Myte.  Over the next six months, Specialized received
four orders from Air Myte to make air starter parts.  For each order, Air Myte provided Specialized
with a drawing, dimensions, or an original part to be copied.

          During this same period, ASAP, a
company that was just getting started in the after-market air starter business,
was looking for a machine shop to make and supply its parts.  ASAP contacted Specialized about that work.  After a number of meetings, an agreement was
reached for Specialized to make the parts for ASAP.  ASAP provided original Ingersoll Rand parts
for Specialized to copy.  Specialized continued
to make parts for ASAP and Air Myte through the remainder of 2001 and early
2002 on an order-by-order basis. 
Specialized also continued to do non-air starter machine shop work for
other customers.

                   2.       Specialized expands into the air starter market

          In early 2002, Specialized decided to expand
into the air starter business. First, as it became more knowledgeable about
this business, Specialized learned that it was more profitable for it to sell
the air starter products it was making to the end-users rather than simply
machining the parts for companies like ASAP and Air Myte. 

          Around this same time, Specialized decided
to expand its board of directors.  Boyd, Kellogg,
Ward, and Molina joined Glattly as directors in February 2002.  During this same period, Morson left
Specialized.  Morson’s departure led to
the loss of much of the non-air starter machining business that he had
generated. As a result, Specialized decided to focus its efforts on expanding
its air starter business to move from a job shop to a production shop.

                   3.       Fuentes goes to work for Specialized

          In order to move from a job shop to a
production shop, Specialized needed additional customers.  Therefore, Specialized decided to look for a
salesperson.  Molina had worked with
Fuentes at Air Starter and suggested that Specialized talk to him.  Molina and Boyd both had several discussions
with Fuentes.  Boyd reported to the Specialized
directors that Fuentes was unhappy and looking to leave Air Starter but wanted
the security of working for a more established company.  To meet his desire, ABCO offered Fuentes a
part-time salesperson job at ABCO, with the understanding that ABCO would bill
Specialized for any time Fuentes spent working on Specialized business.  Fuentes started work at ABCO on July 1, 2002.  However, Fuentes devoted virtually all his
time to generating a potential customer list for Specialized. 

          While working at Air Starter, Fuentes had
developed and expanded the company’s existing client base. As a member of the
Air Starter staff, Fuentes had access to customer data stored on
password-protected computer files and on a backup rolodex.  Six months before leaving Air Starter,
Fuentes signed a nondisclosure agreement contained within his contract in June
2002 (hereafter the “Fuentes contract”).  The contract specified that customer names,
customer addresses, and price lists were Air Starter’s “sole confidential
property.”  Vicky Holly, a co-worker of
Fuentes at ABCO testified that Fuentes stated he had taken a customer list from
Air Starter and was entering it into the computer for use in his new job as
salesman for Specialized.  

          In September 2002, Specialized was
ready to enter the after-market air starter business.  On September 16, 2002, Fuentes became a
full-time employee of Specialized.  Fuentes
began sending sales letters and calling potential customers.  Flyers also advertised that Specialized was
open for business.  Customers began
calling Specialized for parts.

          C.      The
Lawsuit

          After Specialized began its air
starter business in September 2002, Air Starter sued Molina, Fuentes, and Specialized,
alleging misappropriation of trade secrets, violations of the Texas Theft
Liability Act, conversion, breach of contract, unfair competition, and tortious
interference with existing and prospective customer relationships.  Air Starter sought and obtained temporary
injunctions from the trial court.  The
temporary injunctions prohibited the defendants from communicating with certain
customers and from selling certain air starter parts.  Molina, Fuentes, and Specialized appealed the
trial court’s grant of a temporary injunction. 
This Court found that the trial court did not abuse its discretion in
granting a temporary injunction to maintain the status quo.  See
Molina v. Air Starter Components, Inc., No. 01-03-00175-CV, 2004 WL
1277491, at *9 (Tex. App.—Houston [1st Dist.] June 10, 2004, pet. denied) (mem.
op., not designated for publication).

          Over the course of the trial court
proceedings, Air Starter added defendants including the shareholders and
directors of Specialized (Glattly, Boyd, Kellogg, and Ward), other ex-employees
of Air Starter (Brian Wilson and Miguel Matamoros), a customer who did business
with Specialized (Above and Beyond Compression), and a company that packaged
some parts for Fuentes (Universal Starter). 
Air Starter also added a Racketeer Influenced and Corrupt Organizations
(“RICO”) claim.  See 18 U.S.C. §§ 1961–1968.  The case was tried to a jury for
approximately four weeks in September 2007. 

          At the close of Air Starter’s case,
the trial court directed a verdict in favor of defendants Wilson and Matamoros.  The jury returned a verdict partially in
favor of Air Starter and partially in favor of the defendants. Two of the
defendants, Kellogg and Ward, were found to have no liability on any of the
claims asserted by Air Starter.  The jury
found no liability on the RICO and conversion claims.  Although it found liability for the breach of
contract and Texas Theft Liability Act claims, the jury awarded no damages for
either of these claims. 

          The jury did find a misappropriation
of trade secrets concerning Air Starter’s drawings as to Molina, Glattly, and Specialized.  The jury found the damages for the
misappropriation to be $168,036.25 for lost profits.  The jury also found liability for tortious
interference with the Fuentes contract as to Glattly, Specialized, Boyd, and
ABCO, and awarded damages of $600,000 for lost profits.  Furthermore, the jury found shareholders
Glattly, Molina, Boyd, and Fuentes responsible for the obligations of Specialized.


          The trial court conducted post-trial
hearings over the next year.  During one
of these hearings, the trial court decided that the Fuentes contract was, in
part, a covenant not to compete.  The
trial court also determined that the covenant not to compete did not contain a
reasonable limit with respect to time and the court reformed it to limit
Fuentes from competing for a period of two years.  The trial court rendered judgment granting
Air Starter the following relief:

•
a judgment for $168,036.25 against Specialized, Glattly, Boyd, and Fuentes,
jointly and severally for misappropriation of trade secrets;

 

•
a judgment for $600,000 against Specialized, Glattly, Boyd, Fuentes, and ABCO,
jointly and severally, for tortious interference with contract;

 

•
an injunction prohibiting Specialized, Glattly, and Molina from using Air
Starter’s trade secrets; and 

 

•
an injunction prohibiting Fuentes from competing with Air Starter for two
years.

 

Glattly,
Molina, and Specialized (collectively, the “Glattly parties”) appealed from that
judgment.  Boyd, Fuentes, and ABCO
(collectively, “the Boyd parties”) also filed their own notice of appeal, as
did Air Starter.

II. Glattly
Parties’ and Boyd Parties’ Appeals

          In the
Glattly parties’ first issue and the Boyd parties’ fourth issue, they contend
the evidence is insufficient to prove lost profits as a matter of law.  Because we agree, we render judgment in favor
of the Glattly parties and the Boyd parties.

          A.      Jury’s Findings

          The jury provided an amount for
damages for lost profits in response to two questions.  First, after finding that Specialized,
Glattly, and Molina were liable for misappropriation of the drawings that
constituted Air Starter’s trade secrets, the jury answered Question 3, the
damages question.  The only element of
damages the jury was asked to find was Air Starter’s lost profits.  The jury found Air Starter’s lost profits
from the misappropriation of the drawings to be $168,036.25.

          Second, the jury found in response to
Questions 13 and 14 that Specialized, Glattly, Boyd, and ABCO were liable for
tortiously interfering with the Fuentes contract.  In response to Question 16, the jury was
asked to find the damages, if any, Air Starter suffered in the form of lost
profits due to the tortious interference with the Fuentes contract.  The jury found $600,000 in lost profits
damages. 

          B.      Applicable
Law and Standard of Review

          The Supreme
Court of Texas recently stated, 

          The rule
concerning adequate evidence of lost profit damages is well established:

 

Recovery for lost profits does not
require that the loss be susceptible of exact calculation.  However, the injured party must do more than
show that they suffered some lost profits.  The amount of the loss must be shown by
competent evidence with reasonable certainty.  What constitutes reasonably certain evidence
of lost profits is a fact intensive determination.  As a minimum, opinions or estimates of lost
profits must be based on objective facts, figures, or data from which the
amount of lost profits can be ascertained.  Although supporting documentation may affect
the weight of the evidence, it is not necessary to produce in court the
documents supporting the opinions or estimates.

 

ERI Consulting
Engineers, Inc. v. Swinnea, 53 Tex. Sup. Ct. J 683, 2010 WL 1818395, at *9
(Tex. May 7, 2010) (quoting Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992)).  

          “[T]he bare assertion that contracts
were lost does not demonstrate a reasonably certain objective determination of
lost profits.”  Holt Atherton Indus.,
Inc., 835 S.W.2d at 85. “Recovery
of lost profits must be predicated on one complete calculation.”  Id.
“The plaintiff bears the burden of providing evidence supporting a
single complete calculation of lost profits, which may often require certain
credits and expenses.”  ERI Consulting, 2010 WL 1818395, at *9.

          We must
review the legal sufficiency of the competent evidence to determine whether it established
with reasonable certainty the amount of lost profits damages awarded by the
trial court.  See id. at *7.  In so doing,
we “must credit favorable evidence if reasonable jurors
could, and disregard contrary evidence unless reasonable jurors could
not.”  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).  If the
evidence “would enable reasonable and fair-minded people to differ in their
conclusions, then jurors must be allowed to do so.”  Id. at 822.  “A reviewing court cannot substitute its
judgment for that of the trier-of-fact, so long as the evidence falls within
this zone of reasonable disagreement.”  Id. 
Although the reviewing court must “consider evidence in the light most
favorable to the verdict, and indulge every reasonable inference that would
support it[,] . . . if the evidence allows of only one inference, neither
jurors nor the reviewing court may disregard it.”  Id. 
“The final test for legal sufficiency must always be whether the
evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review.”  Id. at
827.  

          A no-evidence point will be sustained
when (a) there is a complete absence of evidence of a vital fact, (b) the court
is barred by rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact, (c) the evidence offered to prove a vital fact
is no more than a mere scintilla, or (d) the evidence conclusively establishes
the opposite of the vital fact.  King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003); Heritage
Housing Dev., Inc. v. Carr, 199 S.W.3d 560, 565 (Tex. App.—Houston [1st
Dist.] 2006, no pet.).

          C.      The Evidence

          Air Starter presented evidence of its
lost profits through Patrice Ferguson, a certified public accountant with
experience calculating lost profits. 
Ferguson testified that Air Starter’s profits lost to Specialized were
$538,715.  Ferguson testified that Air Starter’s
profits lost to Global Pneumatics[2]
were $597,685.      

          In making her damage calculation,
Ferguson assumed Specialized received
an unfair advantage from possessing Air Starter’s drawings and customer
list.  Ferguson further assumed that
every sale ever made by Specialized would have been made by Air Starter and
estimated the profits Air Starter would have made on those sales.  No evidence was presented to support these
assumptions.  Ferguson also testified she
applied the profit margin Heck provided to her, which was based on all of Air
Starter’s business, not a profit margin tied to a particular product or a
particular customer.  No other evidence
was presented to support the profit margin.

          Heck did not testify that he would
have made 100 percent of the sales by Specialized, nor did he testify
concerning his profit margins in general or for specific customers or
products.  Heck did testify concerning
three customers, stating that Above & Beyond Compression was “a good
customer, about $75,000 dollars a year”; Engines Accessories & Controls was
“approximately $80,000, $90,000 dollars a year”; and Gulf Coast Ignition was
“probably $30,000, $40,000 dollars.” 
However, Heck did not state whether those numbers represented gross
income or profits from those three customers. 
Invoices were also introduced showing that Air Starter had made sales to
customers to whom Specialized later made sales. 
However, neither the invoices nor evidence from any other source showed
that all of Specialized’s sales, or any particular sales, would have been made
by Air Starter.     

          On
cross-examination, Ferguson stated that she did not verify that any of
Specialized’s sales would have been made by Air Starter.  Ferguson did not contact any customers or
review the depositions of any customers. 
In her
calculation of lost profits, Ferguson included sales to customers to whom Air
Starter had quit selling for various reasons.  Ferguson included in her calculations sales to
customers that had quit buying from Air Starter because of dissatisfaction with
Air Starter and had gone to other suppliers for their needs.  She also included in her calculations job shop
machine shop work that is not a type of work performed by Air Starter. 

          Ferguson also stated that she had not
been asked to make separate calculations of damages for misappropriation of Air
Starter’s drawings or for tortious interference with the Fuentes contract and
that she was not offering a separate opinion on damages related to only the
drawings or the tortious interference.  Ferguson
testified that she had never been provided with any of the drawings, a list of
the drawings, or a list of the parts shown on those drawings.  Consequently, she stated she did not know
whether Specialized had ever made any of the parts shown on the drawings or
sold those parts.

          Evidence was also elicited from
several of the customers at issue in this case to demonstrate that not all
sales by Specialized otherwise would have been made by Air Starter.  For example, one of the customers
was a company named Carlson and Beauloye. 
Its representative, Valerie Beauloye, testified that she first made a
purchase from Specialized when Air Starter did not have the part she needed in
stock.  She also testified that she had
become dissatisfied with Air Starter because it repeatedly sent her the wrong
parts on an order for a customer of hers. 
As a result, she lost the customer account that was worth between $2,800
and $5,000 a month.  Air Starter also
increased the prices it was charging her, so she began alternating orders
between Air Starter and Specialized, comparison shopping to find the best price.

          Another
customer, Above & Beyond Compression, testified through its representative,
Gary Mills.  Above & Beyond bought
air starters and air starter components from multiple companies, including Air
Starter.  When it became dissatisfied
with the level of service from Air Starter, Above & Beyond began to look
for another vendor and was referred to Specialized.  Above & Beyond continued doing business
with Air Starter as well as Specialized and three other vendors.

          Dieseltron,
another customer, testified through its representative, Gilda Schroer.  Schroer testified that Dieseltron began
buying parts after Air Starter required it to begin placing orders with a local
vendor, Dynatron.  However, Dynatron
charged significantly more for the same parts that Dieseltron had been buying
directly from Air Starter.  Dieseltron
found Specialized when it began looking for another vendor.

          D.      Analysis of Lost Profits Due to Tortious
Interference

          The
issue we must decide is whether Air Starter proved the amount of lost profits
“by competent evidence with reasonable certainty.”  See ERI
Consulting, 2010 WL 1818395, at *9 (quoting Holt Atherton, 835 S.W.2d at 84). 
Air Starter had the burden of “providing evidence supporting a
single complete calculation of lost profits.” 
See id.  

          Ferguson’s
opinion on lost profits assumed that 100 percent of Specialized’s sales would
have been made by Air Starter.  However,
there is no evidentiary basis for that assumption.  Ferguson testified that Heck told her to make
this assumption.  She did no independent
work to verify this assumption and did not review the depositions of customers.  No evidence in the record from any source
shows that all of Specialized’s sales would have been made by Air Starter.  The undisputed evidence establishes that at
least some of the sales Ferguson included would not have been made by Air Starter—either
because the customers had ceased doing business with Air Starter for other
reasons or because the sale was for a type of work not provided by Air Starter.         

          Additionally,
Ferguson used an average profit margin for all of Air Starter’s sales, not a
profit margin associated with a particular product or customer.    Ferguson also made her calculation for lost
profits based on Specialized having both misappropriated drawings and a
customer list.  However, the jury was not
asked to provide an amount of lost profits for both the misappropriated
drawings and the customer list.  The jury
was asked two separate questions concerning lost profits.  The jury was asked to find the amount of lost
profits resulting from the misappropriation of the drawings in Question 3 and
answered $168,036.25.  In response to
Question 16, which asked for the determination of lost profits due to the
tortious interference with the Fuentes contract, the jury answered $600,000.

          Under
these facts, we conclude that Air Starter did not prove the amount of its lost
profits to a reasonable certainty.  See Holt Atherton, 835 S.W.2d at 85–86; Atlas Copco Tools, Inc. v. Air Power Tool
& Hoist, Inc., 131 S.W.3d 203, 209 (Tex. App.—Fort Worth 2004, pet.
denied); Capital Metro. Transp.
Auth./Cent. of Tenn. Ry. & Navigation Co., Inc. v. Cent. of Tenn. Ry. &
Navigation Co., Inc., 114 S.W.3d 573, 581–82 (Tex. App.—Austin 2003, pet.
denied).  In Holt Atherton, the appellees sued Holt Atherton for wrongfully
refusing to repair a tractor pursuant to a warranty.  835 S.W.2d at 82.  On appeal, Holt Atherton asserted that no
evidence supported the trial court’s award of lost profits.  Id.
at 83.  The supreme court agreed, noting,
among other problems with the evidence, that the appellees did not identify
which contracts were lost as a result of Holt Atherton’s actions, how much
profit they would have had from those contracts, or who would have awarded them
contracts.  Id. at 85.  The supreme court
summarized, “[T]he bare assertion that contracts were lost does not demonstrate
a reasonably certain objective determination of lost profits.”  Id.  

          The
Austin court of appeals also found evidence of lost profits legally
insufficient under circumstances similar to the Holt Atherton case.  Capital Metro., 114 S.W.3d at 581–82.  In that case, the only evidence concerning
lost profits came from appellee’s expert, who relied on past reports concerning
the rail line’s performance and the owner’s estimates concerning how many
railcars he could have accommodated each year. 
Id.  The court held that lost profits had not been
proven to a reasonable certainty because the expert calculations were based on
the owner’s assertion of the number of contracts the line could have handled,
which did not constitute reasonably certain objective evidence of lost profits
without additional evidence of the reasonableness or reliability of the
assumptions.  Id. at 581.  Similarly, here,
the only testimony offered concerning lost profits came from Ferguson, who
relied on the bare assumptions provided by Heck, without any other evidence to
support the assumptions. 

           In Atlas
Copco, the Fort Worth court of appeals found the evidence in support of
lost profits legally insufficient.  131
S.W.3d at 209.  The court’s conclusion
rested, in part, on the inclusion of “customers that appellee decided to stop
selling to or relinquish, that were not part of appellee’s territory under the
agreement, and that refused to purchase appellant’s product through appellee
due to dissatisfaction with appellee’s service.”  Id.
at 208–09.  Similarly, here, the evidence
shows a number of customers that ceased purchasing from, or reduced their
purchases from, Air Starter based on their dissatisfaction with Air
Starter.   

          In
contrast, the Texas supreme court recently issued an opinion overturning a
court of appeals’ decision that the evidence of lost profits was legally
insufficient.  In ERI Consulting, ERI brought suit against
Swinnea for statutory fraud, common law fraud, breach of a non-compete
agreement, and breach of fiduciary duty. 
2010 WL 1818395, at *2. 
Swinnea, a former partner in ERI, sold his interest to his
partner and remained as an employee with a non-compete agreement.  Id.
at *1.  However, Swinnea’s wife formed a
business that competed with one of ERI’s clients.  Id.  The client informed ERI that it would no
longer do business with ERI due to Swinnea’s personal involvement with one of
the client’s competitors.  Id. 
After a bench trial, the trial court awarded ERI $300,000 in lost
profits.  Id. at *7.  The court of
appeals reversed and rendered judgment in favor of Swinnea, finding the
evidence of lost profits legally insufficient. 
Id. at *2.

          The Texas
supreme court held that the evidence was legally sufficient to support some
ascertainable amount of lost profits, although the evidence did not prove the
amount awarded by the trial court.  Id. at *8.  ERI presented 20 months of invoices showing
the average revenue per month it made from the client before Swinnea’s
wrongdoing.  Id. at *7.  ERI also
presented 33 months of invoices showing a significantly reduced monthly income
from the client after Swinnea’s wrongdoing. 
Id.  Finally, ERI presented evidence of the profit
margin on the revenue from that client.  Id. 
Unlike the situation in ERI
Consulting, Air Starter presented no evidence to show that it lost any
particular sales to Specialized due to Specialized’s possession of Air
Starter’s customer list or to show the profit margin associated with any
particular customer or any particular product. 
 

          This case more
closely resembles Holt Atherton, Atlas Copco, and Capital Metropolitan than ERI
Consulting.  Ferguson assumed that
100 percent of Specialized’s sales would have been made by Air Starter, without
an objective basis to support that assumption. 
Cf. Holt Atherton, 835 S.W.2d at 85. 
Ferguson assumed Air Starter would have made sales for products or
services not provided by Air Starter and to customers who had ceased buying
from Air Starter for other reasons.  Cf. Atlas Copco, 131 S.W.3d at 208–09.  Ferguson based her lost profits on a margin
provided by Heck that was an average of all of Air Starter’s business, not the
profit associated with the customers or products at issue in this case.  Cf. ERI
Consulting, 2010 WL 1818395, at *8. 
Ferguson did no independent work to verify the reasonableness or
reliability of the assumptions provided by Heck, and no other evidence was
offered in support of those assumptions. 
Cf. Capital Metro., 114 S.W.3d
at 581.  No evidence from any source
shows Air Starter lost any particular sales from the tortious interference with
the Fuentes contract.  Cf. ERI Consulting, 2010 WL
1818395, at *7–8.  Ferguson
did not provide a calculation for lost profits due to tortious interference,
instead providing a calculation based on both the tortious interference and
misappropriation claims.  Cf. ERI Consulting, 2010 WL 1818395, at
*9 (stating plaintiff has
burden of “providing evidence supporting a single complete calculation
of lost profits”) (citing
Holt Atherton, 835 S.W.2d at 85).

          We hold that the evidence
in this case is insufficient to show any amount of reasonably certain lost
profits, based on objective
facts, figures, or data, caused by the tortious interference with Fuentes’s
contract.

          E.      Analysis of Lost Profits Due to Misappropriation
of Trade Secrets

          The
evidence of lost profits due to misappropriation of Air Starter’s drawings
fails for the same reasons that the evidence of lost profits due to the
customer list fails.  Additionally,
Ferguson expressly stated she did not make a separate calculation based on
misappropriation of Air Starter’s drawings. 
She testified her calculations were based on Specialized having both the
drawings and the customer list.  Ferguson
made no effort to perform a lost profit calculation based solely on
misappropriation of Air Starter’s drawings. 
Thus, there is not “one complete calculation” that is based on objective
data showing with reasonable certainty Air Starter’s lost profits due to the
misappropriation of its drawings.  See Holt Atherton, 835 S.W.2d at 84–85.   

          Air
Starter contends that the expert testimony provided by the Glattly and Boyd
parties provides some evidence of lost profits damages.  However, the Glattly and Boyd parties’
expert, James Bratic, specifically testified that, in his opinion, Ferguson’s
testimony concerning lost profits was flawed because she had relied solely on
Heck’s assumptions.  He stated this was
“unusual” for a certified public accountant charged with doing this type of
work.  Bratic also testified that, even
if Ferguson’s damages model was correct, she had overestimated lost
profits.  First, Bratic testified that
Ferguson had included sales to customers that the evidence did not show had
purchased from Air Starter in the past or who had ceased doing business with
Air Starter for other reasons.  Second,
of the remaining sales, Bratic testified it was unreasonable to assume Air
Starter would have made 100 percent of those sales.  Rather, Bratic testified that Ferguson should
have used Air Starter’s market share, which was approximately 40 to 50 percent,
to determine the number of the sales Air Starter would have made.  Applying these two reductions to Ferguson’s
damages model, Bratic testified the most Ferguson should have found in lost
profits was $53,384 to $66,715 for Specialized and $32,948 to $­41,185 for
Global Pneumatics.  Contrary to Air
Starter’s assertions, Bratic did not testify that Air Starter had been damaged,
but conditionally testified that, if Ferguson’s method was correct, she had
failed to make appropriate reductions to her calculations.  Bratic’s testimony is no evidence of lost
profits to Air Starter.  Specifically,
nothing in Bratic’s testimony tends to prove the accuracy or reasonableness of
the assumptions Ferguson used in calculating lost profits.   

          We
sustain the Glattly parties’ first issue and the Boyd parties’ fourth
issue.  We therefore reverse that portion
of the trial court’s judgment awarding damages to Air Starter and render
judgment that Air Starter take nothing on its claims for misappropriation of
trade secrets and tortious interference. 
Because we sustain these issues and render a take-nothing judgment, we
need not discuss the remaining issues raised by the Glattly and Boyd
parties.  See, e.g., CenterPoint Energy
Houston Elec. LLC v. Bluebonnet Drive, Ltd., 264 S.W.3d 381, 392 (Tex.
App.—Houston [1st Dist.] 2008, pet. denied) (declining to reach remaining
issues after determining first issue required reversal and rendition of
take-nothing judgment). 

III. Air Starter’s Appeal

 

          Air
Starter presents eight issues in its appeal, but the Glattly parties and the
Boyd parties respond that Air Starter’s entire appeal is waived.

          A.      Waiver

          As an
initial matter, the Glattly parties and the Boyd parties contend that Air
Starter has waived any error in the trial court’s judgment by requesting the
trial court enter judgment without noting its disagreement as to content.  “Where a litigant moves the trial court to
enter a judgment, and the trial court enters the judgment, the litigant cannot
later complain of that judgment.”  Casu v. Marathon Ref. Co., 896 S.W.2d
388, 389 (Tex. App.—Houston [1st Dist.] 1995, writ denied).  To preserve the right to appeal a judgment, “a
movant for judgment should state in its motion to enter judgment that it agrees
only with the form of the judgment, and note its disagreement with the content
and result of the judgment.”  Id. at 390 (citing First Nat’l Bank of Beeville v. Fojtik, 775 S.W.2d 632, 633 (Tex. 1989)).  However, “merely provid[ing] a draft judgment
to conform to what the court had announced would be its judgment” does not
result in waiver of the appeal.  John Masek Corp. v. Davis, 848 S.W.2d
170, 174–75 (Tex. App.—Houston [1st Dist.] 1992, writ denied); see also In re Bahn, 13 S.W.3d 865, 875 (Tex. App.—Fort Worth 2000, orig.
proceeding) (“A party should not be estopped from challenging a court’s order
when the party provides to the court a proposed order following what it
believes was the court’s ruling at the hearing, and the court signs it.”).

          Although
the proposed judgment fails to note its disagreement as to the contents, Air
Starter did not file a motion for entry of judgment.  Compare
Casu, 896 S.W.2d at 389 with John
Masek Corp., 848 S.W.2d at 174–75.  Furthermore, a review of the record indicates
that the proposed judgment that Air Starter circulated to the parties and the
trial court was made after several hearings on post-trial motions and was
intended to conform to what the trial court had announced as its judgment at
those hearings.  Therefore, Air Starter
has not waived its right to complain of the judgment.  See John
Masek Corp., 848 S.W.2d at 174–75. 

          B.      Relitigation
of Issues from Temporary Injunction

          In its first issue,
Air Starter contends that the trial court erred by construing the contract as a
covenant not to compete instead of a non-disclosure agreement.  Specifically, Air Starter asserts that the
trial court erred because it enforced the contract as a non-disclosure
agreement in the temporary injunction and, therefore, res judicata prevented
the trial court from re-visiting the issue. 
In its third issue, Air Starter asserts the trial court erred by
“finding that the customer lists were not trade secrets” because the issue was
determined in the temporary injunction proceeding.

                    1.       Res Judicata  

           The doctrine of res judicata bars a second
suit by parties on matters actually litigated in an earlier suit, as well as
claims “which, through the exercise of diligence, could have been litigated in
a prior suit.”  Getty Oil Co. v. Ins. Co. of N. Am., 845 S.W.2d 794, 799 (Tex.
1992) (quoting Barr v. Resolution Trust
Corp., 837 S.W.2d 627, 631 (Tex. 1992)). 
For res judicata to apply, there must be: (1) a prior final judgment on
the merits by a court of competent jurisdiction; (2) identity of parties or
those in privity with them; and (3) a second action based on the same claims
that were raised or could have been raised in the first action.  Amstadt
v. U.S. Brass Corp., 919 S.W.2d 644, 652 (Tex. 1996).

          It is
undisputed that this is the first action brought between these parties.  Thus, the first element is not met because
there is no prior final judgment on the merits. 
Nor is the third element met because there is not a “second action”
based on the same claims as were raised in the “first action.”   Furthermore, Texas law is clear that,
generally, a trial court’s ruling on a temporary injunction (or other
interlocutory judgment) does not support the defense of res judicata.  See Williams
v. Houston Firemen’s Relief and Ret. Fund, 121 S.W.3d 415, 437 n.21 (Tex. App.—Houston
[1st Dist.] 2003, no pet.).  

          Air Starter relies
upon a case with an exception to the general rule.  In Brooks
v. Jones, the supreme court stated,

A corollary rule is aptly stated in [Texaco Inc. v. Parker], 373 S.W.2d 870 (Tex. Civ. App.[—]El Paso
1963, writ ref’d n. r. e.), dealing with the choices of a losing litigant in a
hearing on temporary injunction:

 

. . .  A
dissatisfied litigant has a choice—he
may appeal or seek a trial on the merits. 
Having elected to appeal, he should thereafter be bound by matters fully
litigated and determined in the same manner as appeals from final judgments.

 

          In cases
such as this, where the losing party elects not to pursue an appeal, but
instead proceeds to the trial on the merits of a permanent injunction, such
party will not be bound, under the doctrine of res judicata, by those issues
decided in the prior hearing on the temporary injunction.

 

578 S.W.2d 669, 673 (Tex. 1979).  The exception in Brooks applies when (1) the parties elect distinctly to put in
issue matters of law or fact, (2) they fully develop these matters before
trial, (3) the trial court directly determines the matters, and (4) the parties
appeal those matters so that their determination becomes final.  Towers
v. Gogan, No. 01-97-000946-CV, 1998 WL 191760, at *6 (Tex. App.—Houston
[1st Dist.] Apr. 23, 1998, no pet.) (not designated for publication); see also Brooks, 578 S.W.2d at 673 (stating party appealing temporary
injunction order “is bound by matters fully
litigated and determined” (emphasis added)); Visage v. Marshall, 763 S.W.2d 17, 19 (Tex. App.—Tyler 1988, no
writ) (stating exception in Brooks
applies “[w]hen the denial of a temporary injunction follows a hearing in which the merits of the issues raised
were fully developed” (emphasis added)); Garza v. Mitchell, 607 S.W.2d 593, 600 (Tex. Civ. App.—Tyler 1980,
no writ) (stating exception in Brooks
applies “[w]here the parties elect in a temporary injunction suit to put in
issue a right or a question of fact . . . and have it directly determined by the court” (emphasis added)).

          Here, the
record before us does not support the application of Brooks.  The prior proceeding was an
application for a temporary injunction. 
To receive a temporary injunction, a party need not prove it will
prevail on the merits; it must only show “a probable right to recovery.”  Butnaru
v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002).  “The expression ‘probable right to recover’
is a term of art; it does not imply any kind of determination that becomes the
law of the case . . . .”  183/620 Group Joint Venture v. SPF Joint
Venture, 765 S.W.2d 901, 904 (Tex. App.—Austin 1989, writ dism’d w.o.j.).  Our prior opinion notes that the proper
standard of review for an order granting a temporary injunction does not
include the merits of the case, but only whether the trial court abused its
discretion in maintaining the status quo until the trial on the merits.  Molina, 2004 WL 1277491, at *3.  Accordingly, the exception articulated in Brooks does not apply.  See Visage, 763 S.W.2d at 19 (stating
exception in Brooks applies when
merits of issues are fully developed). 
Our prior opinion does not indicate that the trial court made a final
determination of the meaning of the contract and nothing in the opinion
indicates this Court addressed the issue of whether the agreement was a
covenant not to compete or a non-disclosure agreement.  Molina, 2004 WL 1277491, at *3.  Similarly, nothing in our prior opinion
indicates the trade-secret status of the customer list was finally
determined.  Id.  Because the record does
not show the issues of the proper construction of the contract or the status of
the customer lists as trade secrets were before the trial court for final
determination, that the issues were fully developed, or that the trial court
directly and finally determined the issues, the exception Brooks does not apply.  See Towers, 1998 WL 191760, at *6; see also Sharma v. Vinmar Intern., Ltd.,
231 S.W.3d 405, 424 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (“The fact
that a temporary injunction order was issued granting trade secret protection
does not mean the protected information is a trade secret.  That issue will be decided upon the trial on
the merits.”). 

                   2.       Invited
Error  

          Air Starter contends
Specialized invited error by its conduct during the trial and appeal of the
temporary injunction.  Air Starter cites Northeast Texas Motor Lines v. Hodges, Inc.,
158 S.W.2d 487, 488 (Tex. 1942).  In that
case, the supreme court stated that it is “elementary” that a party may not
invite error by asking “something of a court and then complain that the court
committed error in giving it to him.”  Id. 
In support of this argument, Air Starter relies on the same facts it
asserted in its argument concerning res judicata.  Nothing in the record indicates that the
Glattly or Boyd parties asked for or received a ruling that the contract was a
non-disclosure agreement.  To the
contrary, the trial court granted temporary injunctive relief against the Glattly and Boyd parties; it,
therefore, appears that they were not given anything by the trial court, asked
for or not.  Therefore, the invited error
doctrine does not apply.  See id.; see also Tittizer v. Union Gas Corp., 171 S.W.3d 857, 862 (Tex. 2005)
(stating invited error doctrine is inapplicable because party did not ask for
trial court ruling of which it complained on appeal).

                    3.       Estoppel

          Air Starter
also cites Smith v. Chipley for the
proposition that the Glattly and Boyd parties should be estopped from asserting
that the contract is a non-disclosure agreement because “a party will not be
allowed in a subsequent judicial proceeding to take a position in conflict with
a position taken by him in a former judicial proceeding.”  16 S.W.2d 269, 276 (Tex. 1929).  The elements of equitable estoppel arising
from inconsistent positions taken in judicial proceedings are (1) a party takes
clearly inconsistent positions in the same or separate proceedings; (2) the
position first asserted was successfully maintained or upheld; (3) the other
party relied on the position first asserted; (4) adoption of the later position
would result in injury or prejudice to the adverse party; and (5) where more
than one action is involved, there is an identity of parties.  In re
Estate of Loveless, 64 S.W.3d 564, 577–78 (Tex. App.—Texarkana 2001, no
pet.) (citing  Long v. Knox, 291 S.W.2d 292 (Tex. 1956); Smith, 16 S.W.2d at 275–76). 
The burden of proving these elements is on Air Starter.  See Santa
Fe Petroleum, L.L.C. v. Star Canyon Corp., 156 S.W.3d 630, 640 (Tex. App.—Tyler
2004, no pet.) (“The burden of proving an estoppel and the essential elements
thereof rests on the party asserting it, and the failure to prove any one or
more of the elements is fatal.”) (citing Barfield
v. Howard M. Smith Co., 426 S.W.2d 834, 838 (Tex. 1968)).

          Here, as
noted above, Air Starter has not provided this Court with a record showing the
Boyd and Glattly parties raised positions that were “clearly
inconsistent.”  Nor does Air Starter
identify a ruling showing this inconsistent position was “maintained or upheld.”  Air Starter does not address the elements of
“reliance” or “injury or prejudice.”  We
hold Air Starter has not met its burden of proving each element of equitable
estoppel.  See Santa Fe Petroleum, 156 S.W.3d at 640.

          We overrule
Air Starter’s first and third issues.[3]

          C.      Construction
of the Fuentes Contract

          In its second
issue, Air Starter contends the trial court erred by construing the Fuentes
contract as a covenant not to compete. 
Air Starter asserts that the contract’s unambiguous language shows that
it is a non-disclosure agreement. 
Although it has maintained that the Fuentes contract is a non-disclosure
agreement, Air Starter has also consistently argued to the trial court and this
Court that the contract prevents Fuentes from working as a salesman in the same
field (air starters and air starter components) in which he was employed by Air
Starter.  For example, in Air Starter’s
brief before this Court.  Air Starter
states, “Nowhere in the agreement does it state that Fuentes may not go to work
for a competitor of [Air Starter’s].  He
could, but if he did so, he could not disclose the confidential information
that he learned while in [Air Starter’s] employment.”  Air Starter explains what it means by the
second sentence in a footnote, statting, “Fuentes would have been free to work
for Specialized in manufacturing or for Ingersoll-Rand selling air
compressors.”  Similarly, when the trial
court held post-trial hearings to construct the judgment in this case, Air
Starter asserted, “We would ask that Mr. Fuentes, at the
very least be permanently enjoined from selling to any of the companies that
are shown on plaintiff’s exhibit 156, preferably that he be enjoined
permanently from selling air starters . . . .”  Later during the same hearing, Air Starter
argued,

The question of can Mr. Fuentes go to Ingersoll Rand. I
don’t know that that is a good example to use because [Ingersoll Rand] is the
granddaddy of the industry, but could he go to IR in sales. Definitely he could go and sell a product
that was not an air starter. Could 
he go to ASAP, and I think ASAP is a better example because it deals in
the after-market exclusively as does Air Starter Components. And it would be our position that while he
could go to work for them, he shouldn’t be in sales.

 

(Emphasis added). 
Thus, Air Starter has consistently maintained that the effect of the
contract is to keep Fuentes from competing in the area of sales of air starter
components.  Because Air Starter has
consistently requested the trial court and this Court to enjoin Fuentes from
selling air starters and air starter components, we hold Air Starter cannot
complain that the trial court erred by determining the Fuentes contract was a
covenant not to compete.  See Ne. Tex. Motor Lines, 158 S.W.2d at
488; see also Tittizer, 171 S.W.3d at
862 (“[A] party cannot complain on appeal that the trial court took a specific
action that the complaining party requested, a doctrine commonly referred to as
‘the invited error’ doctrine.”).  

          We overrule
Air Starter’s second issue.

          D.      Texas Theft Liability Act

          In its fourth
issue, Air Starter contends it is entitled to attorney’s fees under the Texas
Theft Liability Act as a prevailing party, even thought the jury found no
damages on the Texas Theft Liability Act claim. 
In the alternative, Air Starter asserts in its fifth issue that the
jury’s answers are inconsistent and should be construed as finding damages on
the Texas Theft Liability Act claim.

                   1.       Prevailing
Party

          Air Starter
contends that it was entitled to attorney’s fees as a prevailing party under
the Texas Theft Liability Act, even though the jury found no damages for the
violation of that statute.  See Tex. Civ.
Prac. & Rem. Code Ann. §§ 134.001–.005
(Vernon 2005).  The Texas Theft Liability Act provides civil liability
for certain acts proscribed by the Texas Penal Code, including unlawfully
appropriating a trade secret.  See id. § 134.002(2);
IBP, Inc. v. Klumpe, 101 S.W.3d 461, 472 (Tex. App.—Amarillo 2001, pet.
denied).  The Texas Theft Liability Act
provides that a person “who commits theft is liable for the damages resulting
from the theft.”  Tex. Civ. Prac. & Rem. Code Ann.
§ 134.003(a).  In addition, under
the Texas Theft Liability Act a person “who has sustained damages” may recover the amount of actual
damages found by the trier of fact.[4]  Id.
§ 134.005(a)(1). 
Finally, a “person who prevails” in a suit under the Act “shall be
awarded court costs and reasonable and necessary attorney’s fees.”  Id.
§ 134.005(b).  However, the Act does
not define a “person who prevails.”  See id.  


          Air
Starter contends that it prevailed because the jury found a violation of the
Texas Theft Liability Act, even though the jury answered “0” on the damages
question.  The Texas supreme court
recently addressed the issue of what it means to be a prevailing party.  In Intercontinental
Group Partnership v. KB Home Lone Star L.P., the supreme court stated that
a party was not a prevailing party on a breach of contract claim when the jury
found a breach of contract but answered “0” for damages.  295 S.W.3d 650, 654–55 (Tex. 2009).  In Intercontinental,
the issue was a contract that provided for attorney’s fees for the prevailing
party but did not define prevailing party. 
Id. at 653–54.  The supreme court noted the ordinary meaning
of prevailing party should be used.  Id. 
The supreme court held that a party that did not receive damages or
other relief on its claim could not be a prevailing party.  Id.
at 655–56.  Because the jury found no
damages for the violations of the Texas Theft Liability Act, we hold that Air
Starter was not a prevailing party.  See id.

          Air Starter
also asserts in its reply brief that it received injunctive relief and, thus,
should be considered a prevailing party. 
However, Air Starter did not raise this ground for reversing the trial
court until its reply brief; it is, therefore, waived.  McAlester Fuel Co. v. Smith Int’l, Inc., 257 S.W.3d 732, 737 (Tex.
App.—Houston [1st Dist.] 2007, pet. denied) (citing N.P. v. Methodist Hosp., 190 S.W.3d 217, 225 (Tex.
App.—Houston [1st Dist.] 2006, pet. denied); Lopez v. Montemayor, 131 S.W.3d 54, 61 (Tex. App.—San
Antonio 2003, pet. denied); Zamarron v. Shinko Wire Co., 125 S.W.3d 132, 139 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied)).  Even
if we reached the issue, we note that the Texas Theft Liability Act does not
authorize injunctive relief.  It provides
only that a person “who has
sustained damages” may recover the amount of actual damages found by the
trier of fact.  Tex. Civ. Prac. & Rem. Code
Ann. § 134.005(a)(1).  The only relief provided for by the Theft
Liability Act is actual damages and that is the only relief Air Starter
requested from the jury, which the jury denied by finding “0” for actual
damages.  See Hawkins v. Walker, 233 S.W.3d 380, 400 & n.73 (Tex.
App.—Fort Worth 2007, no pet.) (stating, “[C]ourts have construed this phrase
[‘prevailing party’] to mean that the party must recover at least some of the
relief sought by its claim.”).

          Air
Starter cites to a prior case from this Court that held an award of zero
damages did not preclude attorney’s fees as the prevailing party under the
Texas Theft Liability Act.  See Johns v. Ram-Forwarding, Inc., 29 S.W.3d
635, 638 (Tex. App.—Houston [1st Dist.] 2000, no pet.).  In that case, we stated, “[W]e hold that
Ram-Forwarding was entitled to recover attorney’s fees even though it recovered
zero damages for its civil theft claim.” 
Id.  However, the reasoning this Court employed
was that a party could “prevail” without recovering damages.  Id.  Given the supreme court’s holding in Intercontinental that a party who does
not receive any relief on its claim cannot be the prevailing party under the
ordinary meaning of that term, this Court’s prior opinion is no longer a
correct statement of the law concerning “prevailing party.”  We therefore decline to follow Johns to the extent it has been
implicitly overruled by the supreme court’s decision in Intercontinental.  See Intercontinental, 295 S.W.3d at
654–55 (holding jury’s finding of liability on party’s claim does not bestow
“prevailing party” status when party received no relief on that claim).

          We
overrule Air Starter’s fourth issue.

                   2.       Inconsistent
Jury Answers

          In the alternative, Air Starter
asserts in its fifth issue that the jury’s answers conflict and this Court
should reconcile the jury’s answers to “supply the damages . . . to support an
award of attorney’s fees” under the Texas Theft Liability Act.  To
preserve error that the jury’s findings are inconsistent, the complaining party
must raise an objection in the trial court before the jury is discharged.  Oyster Creek Fin. Corp. v. Richwood Inv.
II, Inc., 176 S.W.3d 307, 324 (Tex. App.—Houston [1st Dist.] 2004, pet.
denied); see also Kennedy Ship & Repair, L.P. v. Pham, 210 S.W.3d
11, 24 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

          After
receiving the jury’s verdict, the trial court asked, “Is there any other matter we need to take up before I
release this jury?”  Air Starter’s
counsel answered “Not that I’m aware of at this time.”  The other attorneys present answered, “Not
that I’m aware of, Your Honor,” or, “No, Your Honor.”  The trial court stated, “There being none I
will proceed to release the jury.”  After
thanking the jury, the trial court told the jury, “You are excused and released.”  Because Air Starter did not raise an
objection to an inconsistency or conflict before the trial court discharged the
jury, it has not preserved that issue for appeal.  See Oyster
Creek, 176 S.W.3d at 324; see
also Kennedy Ship & Repair, 210 S.W.3d at 24.

          We overrule
Air Starter’s fifth issue.

          E.      Injunction

 

          In its sixth
issue, Air Starter contends the trial court erred by enjoining Specialized,
Molina, and Glattly from using Air Starter’s drawings for a period of 30 years
instead of enjoining them permanently. 
Specifically, at the conclusion of this section of its argument, Air
Starter states that the trial court erred by not enjoining “[Specialized],
Boyd, Molina, Glattly, and Fuentes, permanently,
from manufacturing any of the parts manufactured by [Air Starter].”  (Emphasis in original.)  Similarly, in its prayer, Air Starter asks
for “[e]ntry of a permanent injunction against Fuentes, Molina, Boyd, Glattly,
and [Specialized] from manufacturing any parts that compete with those that Air
Starter manufactures.”

          The
decision to grant or deny a permanent injunction is ordinarily within the sound
discretion of the trial court, and appellate review of the trial court’s action
is limited to the question of whether such action constituted a clear abuse of
discretion.  Butler v. Arrow Mirror & Glass, Inc., 51 S.W.3d 787, 791 (Tex. App.—Houston
[1st Dist.] 2001, no pet.).  An abuse of
discretion occurs if the trial court acts arbitrarily and unreasonably, without
reference to guiding rules or principles, or misapplies the law to the
established facts of the case.  Id. 
An abuse of discretion does not exist if the trial court heard
conflicting evidence, and evidence appears in the record that reasonably
supports the trial court’s decision.  Id. at 792.  We may not substitute our judgment for that
of the trial court.  Id.   

          Here,
the trial court entered an injunction against Glattly, Molina, and Specialized,
stating they “are ENJOINED for a period of thirty (30) years from the date of
this judgment, from using any of the information contained on or in the
physical drawings and AutoCAD drawings (of the air starters that Air Starter
Components, Inc., manufactures) to manufacture competing air starters.”

                   1.       Length
of the Injunction

          Air Starter
contends the trial court erred by limiting the length of the injunction to 30
years instead of making it permanent. 
Air Starter asserts that, because the drawings were stolen, Air
Starter’s rights remain superior to those of Glattly, Molina, and
Specialized.  Air Starter also asserts
that the trial court’s order essentially gives Glattly, Molina, and Specialized
title to the stolen drawings after 30 years, but that “no one ever acquires
title to stolen property through the passage of time.”  In their appellees’ brief, the Glattly
parties reply that the trial court did not abuse its discretion because the
prohibition on improperly using Air Starter’s trade secrets “does nothing more
than the law already does in prohibiting a party from using someone else’s
trade secrets.”  As the Glattly parties
acknowledge,  “[t]hat prohibition exists
even without the injunction and will continue to exist thirty years from
now.”  

          The Texas
supreme court has affirmed a permanent injunction to prevent the improper use
of trade secrets.  K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.,
314 S.W.2d 782, 790 (Tex. 1958).  Because
the supreme court has affirmed the use of a permanent injunction and the
Glattly parties acknowledge they are prohibited from ever using Air Starter’s
drawings, we conclude the trial court erred by limiting the injunction to 30
years.  

          We sustain
this portion of Air Starter’s sixth issue.

                   2.       Scope
of the Injunction

          Within its
sixth issue, Air Starter contends the trial court erred by limiting the scope
of the injunction to use of trade secrets without including the manufacture of
competing parts, and by failing to enjoin Boyd and Fuentes.  

          By seeking an
order that prohibits any competition by “manufacturing any parts that compete
with those that Air Starter manufactures,” Air Starter’s requested injunction seeks
more protection than the law’s prohibition on the use of trade secrets.  See Sharma,
231 S.W.3d at 424.   Here, the jury found
that Air Starter’s drawings were trade secrets. 
Trade secrets are entitled to protection; the law “forbids an employee
from using trade secret information acquired during the employment relationship
in a manner adverse to the employer.”  Id. 
Because the jury’s findings, therefore, concern trade secrets only, the
trial court did not abuse its discretion by failing to prohibit competition
with Air Starter.  Furthermore, the jury
found that Glattly, Molina, and Specialized had misappropriated trade secrets, but
it did not make the same finding concerning Boyd and Fuentes, and Air Starter
has not challenged this jury finding on appeal. 
There is no jury finding of misappropriation of trade secrets against
Boyd and Fuentes, the parties Air Starter seeks to enjoin in this appeal.  We hold that the trial court properly did not
enjoin Boyd and Fuentes, as the jury made no findings that they had
misappropriated trade secrets.

          We overrule
this portion of Air Starter’s sixth issue.

          F.      Attorney’s
Fees

          In its
seventh issue, Air Starter contends the trial court erred by refusing to award
attorney’s fees.    

          Air Starter
contends that, under Texas common law, a party may recover its attorney’s fees
under a contract if the contract so provides. 
The Fuentes contract states, “[Air Starter] will also be entitled to
recover reasonable attorney’s fees, expert fees and costs in any action which it
brings against [Fuentes] to enforce its rights under this Agreement.”  As noted earlier in this opinion, Air Starter
asked the trial court to prevent Fuentes from competing against Air Starter and
the trial court granted that request.  We
address whether Air Starter, the employer, may recover its attorneys to enforce
a covenant not to compete against Fuentes, its employee.


                   1.       Applicable
Law

          Section 15.50
of the Covenants Not to
Compete Act provides the criteria for enforceability of covenants not to
compete.  Tex. Bus. & Com. Code Ann. § 15.50
(Vernon Supp. 2009).  These criteria, which are not at
issue in this appeal, include that the covenant must (1) be ancillary to or
part of an otherwise enforceable agreement at the time the agreement is made
and (2) contain limitations as to time, geographical area, and scope of
activity to be restrained that are reasonable and do not impose a greater
restraint than is necessary to protect the goodwill or other business interest
of the promise (i.e, the employer).  Id.; Light
v. Centel Cellular Co. of Tex., 883 S.W.2d 642, 643 (Tex. 1994), holding modified by Alex Sheshunoff Mgmt.
Servs., L. P. v. Johnson, 209 S.W. 3d, 644 (Tex. 2006).  Section 15.51, entitled “Procedures and
Remedies in Actions to Enforce Covenants not to Compete,” provides, in pertinent
part,    

If the covenant . . . contains limitations as to time,
geographical area, or scope of activity to be restrained that are not
reasonable and impose a greater restraint than is necessary to protect the
goodwill or other business interest of the [employer], the court shall reform
the covenant to the extent necessary to cause the limitations contained in the
covenant as to time, geographical area, and scope of activity to be restrained
to be reasonable and to impose a restraint that is not greater than necessary
to protect the goodwill or other business interest of the [employer] and
enforce the covenant as reformed, except that the court may not award the [employer]
damages for a breach of the covenant before its reformation and the relief granted
to the [employer] shall be limited to injunctive relief.

   

Tex. Bus.
& Com. Code Ann. § 15.51(c) (Vernon 2002).  The second sentence of 15.51(c) also provides
that a court “may” award attorney’s fees “incurred by the [employee] defending
the action to enforce the covenant,” if the employee proves that (1) the
employer knew the restrictions in the covenant were unreasonable at the time of
the execution of the agreement and (2) the employer sought to enforce the
covenant “to a greater extent than was necessary to protect the goodwill or
other business interest of the [employer].” 
Id.  Section 15.52, entitled “Preemption of Other
Law,” provides, 

 [T]he procedures
and remedies in an action to enforce a covenant not to compete provided by
Section 15.51 of this code are exclusive and preempt any other . . . procedures
and remedies in an action to enforce a covenant not to compete under common law
or otherwise.

 

Tex. Bus.
& Com. Code Ann. § 15.52 (Vernon 2002).  The San Antonio court of appeals has
specifically stated that “section 15.52 preempts an award of [attorney’s] fees
under any other law.”  Perez v. Tex. Disposal Sys., Inc., 103
S.W.3d 591, 594 (Tex. App.—San Antonio 2003, pet. denied); see also Light, 883 S.W.2d at 644 (noting Covenants Not to Compete
Act intended “to largely supplant the Texas common law relating to enforcement
of covenants not to compete” and thus courts apply the Act “in lieu of ‘any
other . . . procedures and remedies in an action to enforce a covenant not to
compete under common law or otherwise’”).




 

                   2.       Analysis

          Here, this
case involves “an action to enforce a covenant not to compete.”  Thus, the Covenants Not to Compete Act
applies and preempts “any other . . . procedures and remedies,” including the
common law.  Tex. Bus. & Com. Code Ann. § 15.52;
Light, 883 S.W.2d at 644.  Section 15.51(c) only provides for an award
of attorney’s fees to an employee in limited circumstances; it makes no
provision for an award of fees to an employer. 
Tex. Bus. & Com. Code Ann.
§ 15.51(c).  Because the
Covenants Not to Compete Act preempts all other procedures and remedies, it “preempts
an award of [attorney’s] fees under any other law.”  Perez,
103 S.W.3d at 594.  This includes the
common law that a party may recover attorney’s fees if provide for by
contract.  See Tex. Bus.
& Com. Code Ann. § 15.52; Light, 883 S.W.2d at 644; Perez, 103 S.W.3d at 594.  We hold that the trial court properly denied
Air Starter’s requests for attorney’s fees because the Covenants Not to Compete
Act does not permit employers to recover their attorney’s in suits to enforce
their rights under the Act.  See Perez, 103 S.W.3d at 594.

          We overrule
Air Starter’s seventh issue.

          G.      Discovery of Computer Hard Drives

 

          In its eighth
issue, Air Starter contends the trial court erred by denying its motion to
compel production of an un-redacted copy of the hard drives of Specialized’s
computers.  Specifically, Air Starter
contends Specialized should not be able to rely on the attorney-client
privilege because Specialized’s possession of the drawings on the hard drives
was an ongoing crime or fraud.

          If the trial court errs in
making a discovery ruling, the complaining party must still show harm on appeal.  Ford
Motor Co. v. Castillo, 279 S.W.3d 656, 667 (Tex. 2009) (citing Tex. R. App. P. 44.1(a)). 
Harmful error is error that “probably caused the rendition of an
improper judgment” or “probably prevented the appellant from properly
presenting the case to the court of appeals.” 
Id. (quoting Tex. R. App. P. 44.1(a)). 
Here, Air Starter identifies no harm that it suffered as a result of the
trial court’s decision to deny discovery of Specialized’s hard drives.  Accordingly, we overrule Air Starter’s eighth
issue.  See id.; Tex. R.
App. P. 44.1(a);
see also City of Brownsville v. Alvarado,
897 S.W.2d 750, 753–54 (Tex. 1995) (noting successful challenge to evidentiary
rulings usually requires complaining party to show that judgment turns on
particular evidence excluded or admitted). 


Conclusion

          We
reverse that portion of the trial court’s judgment awarding damages to Air
Starter and render judgment that Air Starter take nothing in its claim for
damages.  We also modify that portion of
the trial court’s judgment enjoining Specialized, Glattly, and Molina from
using Air Starter’s trade secrets for a period of 30 years by removing the time
restriction from the injunction.  As
modified, we affirm the remainder of the judgment.   

 

 

                                                                   Elsa
Alcala

                                                                   Justice


 

Panel consists of Justices Jennings, Alcala,
and Massengale.

 

 











[1]         Air starters
are used on almost every type of large diesel engine equipment in the world,
including buses, trains, barges, cranes, large trucks, and on turbines used in
the oil and gas industry for power generation and compression.  Ingersoll Rand developed and patented many of
the original air starters and their component parts.  As those patents expired, a substantial
after-market developed for “knockoffs” of the Ingersoll Rand parts.  A number of companies compete in this market.





[2]           Global Pneumatics was the assumed name
used by Fuentes in his business repairing and rebuilding air starters after
Specialized ceased doing business.  There
is no evidence that Molina, Glattly, Boyd, or Specialized had anything to do
with Global Pneumatics.  





[3]           In its reply brief, Air Starter raises
“judicial estoppel” as an additional reason the trial court should not have
revisited the construction of Fuentes contract. 
However, Air Starter did not raise this ground for reversing the trial
court until its reply brief and it is therefore waived.  See McAlester Fuel Co. v. Smith Int’l, Inc., 257 S.W.3d 732, 737 (Tex. App.—Houston
[1st Dist.] 2007, pet. denied) (“An issue raised for the first time in a reply
brief is ordinarily waived and need not be considered by this Court.”) (citing N.P.
v. Methodist Hosp., 190
S.W.3d 217, 225 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); Lopez v.
Montemayor, 131 S.W.3d 54,
61 (Tex. App.—San Antonio 2003, pet. denied); Zamarron v. Shinko Wire Co., 125 S.W.3d 132, 139 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied)). 





[4]           The Texas Theft Liability Act also
provides for additional “damages awarded by the trier of fact in a sum not to
exceed $1,000 . . . .”  Tex.
Civ. Prac. & Rem. Code Ann.
§ 134.005(a)(1) (Vernon 2005).  However,
additional damages are not an issue in this case.